**In re Olen DREYER, Debtor.**

**Harvey L. MORTON, Trustee, Plaintiff,**

**v.**

**Olen DREYER, Defendant.**

**TEXAS COMMERCE BANK, SAN ANGELO, N.A., Plaintiff,**

**v.**

**Olen DREYER, Defendant.**

**Bankruptcy No. 690–60063–7.**

**Adv. Nos. 690–6021, 690–6022.**

United States Bankruptcy Court, N.D. Texas, San Angelo Division.

May 28, 1991.

Jack Bryant, Abilene, Tex., for debtor.

Walter Pfluger, Shannon, Porter, Johnson, Pfluger & Davis, San Angelo, Tex., for the bank.

Harvey L. Morton, trustee-in-bankruptcy, Lubbock, Tex.

Joseph F. Postnikoff, McWhorter, Cobb & Johnson, Lubbock, Tex., for trustee.

## MEMORANDUM OPINION ON DENIAL OF DISCHARGE

JOHN C. AKARD, Bankruptcy Judge.

Harvey L. Morton, Trustee–in–Bankruptcy (Trustee) and Texas Commerce Bank, San Angelo, N.A. (TCB) object to receipt of a discharge in bankruptcy by Olen Dreyer (Mr. Dreyer) under § 727(a) of the Bankruptcy Code.[1] Mr. Dreyer contended that although he made some mistakes in handling this case, his acts and conduct were not fraudulent and, thus, would not require denial of his discharge. The court is aware that one object of bankruptcy is a fresh start for the debtor in his financial life. Prohibiting that fresh start by denial of a discharge is a matter of serious concern, both to the court and to Mr. Dreyer who is 69 years of age. However, after a careful review of the testimony and evidence taken at the hearing on this matter, the court finds that it must deny Mr. Dreyer's discharge.[2]

## FACTS

Mr. Dreyer, a high school graduate, went into the coin operated machine business in 1949 or 1950. In 1968 he incorporated the business as Dreyer Music Company. The business supplied coin operated music machines, game machines and cigarette machines to restaurants and bars. The opera-

---

**1.** The Bankruptcy Code is 11 U.S.C. § 101 *et seq.* References to section numbers are references to sections in the Bankruptcy Code.

**2.** This court has jurisdiction of this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J).

tor of the restaurant or bar (the location) received half of the proceeds from the coin operated machines and a percentage of the cigarette sales. Mr. Dreyer provided and serviced the machines, and replenished the cigarette supplies. His employees followed regular routes to service the machines and collect the funds. The location operator signed a receipt for his portion of the proceeds. The route salesman then turned that receipt in to the office, along with the balance of the machine proceeds. In some instances Mr. Dreyer owned or leased the location himself and leased or subleased it to an operator. Mr. Dreyer sometimes loaned money to operators and was repaid from the operator's portion of the machine receipts.

The corporation's principal office was located in San Angelo, Texas, and serviced a 100 mile radius. The Big Spring, Texas, office serviced a radius of 70 miles and the office in Abilene, Texas, serviced a radius of 75 miles. During the 1970's he also operated in Lubbock, Texas, and from 1971 until 1980 he operated in the Dallas area. The business' best years were 1982 and 1983 when gross receipts totaled between $3 and $4 million each year.

During all of its history Mr. Dreyer served as president and was sole shareholder of the corporation. Except for tax purposes, however, the court finds that the corporation existed more in name than in actuality. When he formed it in 1968, title to assets never changed from Mr. Dreyer to the corporation. The corporation issued no stock. Mr. Dreyer's personal expenses were paid from corporate bank accounts and assets were used both by Mr. Dreyer and the corporation without distinction as to ownership. In effect Mr. Dreyer and the corporation were synonymous.

Over the years Mr. Dreyer gave numerous financial statements to TCB and to various other parties. While his office employees prepared the statements, he reviewed and signed them before submitting them to a creditor. A statement dated February 14, 1986 showed cash on hand and in banks of $136,000.00 (representing deposits in four banks and $70,000.00 on hand and in a safe deposit box), four life insurance policies with a cash surrender value of $172,000.00, 100% ownership in Dreyer Music Company valued at $4,500,-000.00, and net worth of $5,655,250.00. A statement dated February 23, 1987 showed $24,000.00 in the safe deposit box, the company valued at $4,500,000.00, life insurance policies with a cash surrender value of $169,000.00, a note receivable from the Ramada Inn at $50,000.00 and a net worth of $5,451,500.00. A statement dated July 16, 1987 contained basically the same information.

The corporation's September 30, 1989 financial statement showed annual income to the corporation of $1,064,589.51, net income of $109,570.35, and listed the corporation's book value at $690,225.84. A schedule showed that the corporation owned 23 parcels of real estate. A similar statement dated April 30, 1990 showed gross income for the preceding seven months of $378,-092.66, net income of $34,860.49, and book value of $628,692.13. It showed 24 parcels of real estate with the addition of a warehouse in Abilene, Texas, not shown on the September, 1989 schedule.

A certified public accountant kept the books, and prepared tax returns and periodic financial statements for the business. Mr. Dreyer's 1989 tax return showed income of $22,400.00 from the corporation and alimony payments to his former wife, Ella Dreyer, in the amount of $25,920.00 for a net loss of $3,520.00. Mr. Dreyer explained his ability to live on a negative income by testifying that the corporation paid many of his expenses and that he drew Social Security. His income tax return did not reflect this income.

A statement dated January 9, 1990 listed the $50,000.00 Ramada Inn note, the corporation value at $4,500,000.00, cash on hand and in safe deposit boxes of $65,000.00, insurance policies with a cash surrender value of $155,000.00 and a net worth of $5,089,000.00. Testimony showed that a state district judge received this statement in connection with Mr. Dreyer's bail bond business (operated by Mr. Dreyer's son-in-law, James Smith). Mr. Dreyer furnished

blank signed bonds which Mr. Smith or court officials filled in under Mr. Smith's direction.

On January 20, 1990 Mr. Dreyer gave a financial statement to TCB in connection with attempts to refinance three buildings upon which the bank held a lien. The statement listed cash on hand of $1,650.00, stock in Dreyer Music Company worth $800,000.00 and no other assets or liabilities except alimony to his former wife, for a net worth of $801,650.00. He listed his salary at $55,000.00 per year.

Mr. Dreyer's son, Ralph, is a licensed attorney. He learned about the coin operated machine business while growing up. He also performed legal service for the business beginning in 1987. While not a frequent practitioner in bankruptcy court, Ralph Dreyer represented a number of debtors in bankruptcy proceedings and appeared in bankruptcy court in San Angelo, Texas.

Early in 1990 Mr. Dreyer discussed with Ralph Dreyer the possibility of filing bankruptcy. In early March, 1990 Mr. Dreyer borrowed $20,000.00 from the State National Bank of Big Spring. On March 5, 1990 he took those funds to TCB to make a partial payment and to try to refinance his obligations. (TCB previously posted the three properties on which it held a lien for foreclosure on March 6, 1990.) When TCB refused his proposal, he contacted his son. They agreed that Mr. Dreyer should file bankruptcy. They met at Ralph Dreyer's office early the next morning, prepared the petition and schedules and filed them at 10:30 a.m. The only income shown on the statement of current income and expenditures filed with that petition was $334.00 a month in Social Security income. The statement listed expenses at $3,221.00 including alimony of $2,160.00. In response to question 2–d of the Statement of Affairs, Mr. Dreyer showed his 1988 income from the music company at $15,000.00 and his 1989 income at $12,000.00. In addition, he listed two pending suits and three terminated suits. Under "secured creditors" he listed TCB and Central National Bank with "the details to be provided as soon as possi-

ble." He listed two unsecured creditors, J.E.M. Properties, Inc. and Raymond Chvojka. Schedule B–1 Real Property contained the statement "detailed list of property to be supplied as soon as possible." He listed two life insurance policies with a total cash value of $1,000.00 and the stock in Dreyer Music Company with an "undetermined" value. Mr. Dreyer did not choose either the state or federal exemptions, but stated that he claimed "all personal property—to be supplied at a later date." He listed only six names on the address label matrix provided with the petition.

The creditors' meeting held April 9, 1990 was somewhat hurried because the first meeting in another large and complicated case was held the same day. Mr. Dreyer's statements to the Trustee indicated that the corporate stock had no value. Questions by TCB's attorney indicated that there were omissions in the schedules.

On April 25, 1990 Mr. Dreyer filed amended schedules. They showed no change in the statement of income and expenses, and the response to Question 2–b of the Statement of Affairs listed the same business income. The amended schedules did add a third secured creditor along with some details concerning the two originally listed secured creditors. The amended schedules listed six unsecured creditors, seven parcels of real property and a third life insurance policy (raising the cash value to $3,401.25). The Dreyer Music Company stock still was listed at undetermined value and claimed as exempt—again without an election of either the state or federal exemptions. Ralph Dreyer testified that the stock was listed as exempt because he thought it was worthless and he "thought the Trustee would abandon it or whatever." He stated that the figures provided by the accountant were not up to date because a lot of valueless equipment was still carried on the financial statements. Mr. Dreyer testified that the coin machines were depreciated by 90% during the first three years and that a 10% residual value

was retained.[3]

Mr. Dreyer continued to operate the business after filing his bankruptcy petition. He made no attempt to close the business or to surrender possession of it to the Trustee. He drew no salary from the business during that time, but he paid his expenses (presumably including his alimony payments) from the business. Subsequent to filing the bankruptcy petition, the Comptroller of Public Accounts of the State of Texas suspended the corporation's charter for non-payment of taxes. The Trustee became aware that the business had substantial assets. The Trustee and TCB objected to the claim of the corporate stock as exempt. On August 29, 1990 the court held a hearing on that matter. At that hearing Ralph Dreyer agreed on behalf of his father to turn over the corporation and all its assets to the Trustee. On that date the Trustee took possession of the corporation.[4]

From late September, 1990 Bruce Rogers operated the business for the trustee. He stated that he found the records in extreme disarray and that the files were incomplete. Although he searched, he found no life insurance policies. Sometime in August, 1990, Mr. Dreyer acquired some machines and went back into the coin machine business.

On November 8, 1990 Ralph Dreyer withdrew as attorney for his father and Jack Bryant succeeded him. On February 25, 1991, two days before trial of these adversary proceedings began, Mr. Dreyer filed further amendments to the statement of affairs and schedules.

## DISCUSSION [5]

The court will discuss each ground for denial of discharge asserted by TCB and the Trustee.

3. The corporate balance sheet prepared by the accountant as of September 30, 1985 listed fixed assets at $5,775,310.61 less an allowance for depreciation of $5,109,080.24 leaving net fixed assets (including real estate) of $636,230.37. In the April 30, 1990 statement the corresponding figure was $642,924.87.

4. Apparently its taxes were paid and its charter reinstated. The corporation continues in operation under the Trustee's direction.

### Hinder and Delay

■ The Bank and the Trustee asserted that Mr. Dreyer violated § 727(a)(2) which reads in pertinent part as follows:

(a) The court shall grant the debtor a discharge unless—

. . . .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition. . . .

The hastily prepared schedules filed on March 6, 1990, rather than describing assets and liabilities, stated that details would be furnished at a later time. Rule of Bankruptcy Procedure 1007(a)(1) provides that in a voluntary case "the debtor shall file with the petition a list containing the name and address of *each* creditor" (emphasis added). The statements and schedules may be filed within 15 days thereafter. Rule 1007(c). The original petition did not contain a full list of the creditors and the amended statements and schedules should have been filed within 15 days thereafter. Mr. Dreyer did not request an extension of time to file the amended statements and schedules pursuant to Rule 1007(a)(4). Ralph Dreyer, as an attorney with experience in the bankruptcy court, knew that his father had to timely file full, complete, and

5. Additional findings of fact are contained in the Discussion as are necessary for an understanding of the Discussion. In addition, the court adopts the summary of agreed facts contained in the pretrial order and the "Stipulations to Supplement Joint Pre–Trial Order" filed March 4, 1991.

accurate statements and schedules. Neither Ralph Dreyer nor his father saw that this duty was accomplished. The amended schedules were filed April 25, 1990, fifty days after the filing of the original petition and 21 days after the meeting of creditors. The attempt to "patch things up" by filing yet another amendment almost a year after the petition was filed was to no avail. As will be discussed below, the first two sets of schedules omitted a number of assets and liabilities.

The movant bears the burden of establishing actual intent to defraud under § 727(a)(2)(A), which may be inferred by the debtor's actions and may be proved by circumstantial evidence. *Povy v. Chastant (In re Chastant)*, 873 F.2d 89 (5th Cir. 1989). The court finds that the Trustee and TCB carried their burden of proof.

The bankruptcy system relies on a debtor to deal honestly with his creditors by making full, complete and honest disclosure in his statements and schedules. *Hudson v. Wylie*, 242 F.2d 435 (9th Cir.), *cert. denied*, 355 U.S. 828, 78 S.Ct. 39, 2 L.Ed.2d 41 (1957). Instead, Mr. Dreyer took a course of action designed to furnish only the information he wished to furnish. Other matters were revealed only when he got caught. The bankruptcy court cannot tolerate such an approach.

The testimony and evidence at hearing showed that both Mr. Dreyer and Ralph Dreyer knew that the corporation had substantial value and that they deliberately attempted to conceal the true value from the Trustee by listing its value as undetermined, by stating to the Trustee at the creditors' meeting that the corporation had no value, and by attempting to claim the corporate stock as exempt. Both Dreyers well knew that the corporate stock could not be claimed as exempt under any provision of Texas exemption laws. The only possible way Mr. Dreyer could claim exemption for the stock was to take the federal exemptions, in which case the total value of the stock had to be less than $4,150.00.[6] The figures recited previously for the income and book value of the corporation on September 30, 1989 and April 30, 1990 clearly demonstrated that the corporate stock could not be claimed as exempt. Mr. Dreyer chose to ignore this and claimed the stock as exempt. The court finds that Mr. Dreyer took these actions with intent to hinder, delay and defraud his creditors.

Mr. Dreyer sought to excuse his schedules and his actions in retaining control of the business after the bankruptcy filing by stating that he relied on his attorney. When questioned at hearing about his business and financial affairs by the Trustee and TCB's attorney he repeatedly testified that he did not know or that he did not remember. When questioned by his attorney, however, his memory was much improved. The court cannot give credence to Mr. Dreyer's selective amnesia. He operated a business that at one time grossed between $3 and $4 million dollars per year and which, as late as the year ending September 30, 1989, grossed over $1 million. He actively participated in day to day business operations. Both he and his attorney knew that the business should have been turned over to the Trustee on the date the bankruptcy was filed. Instead, Mr. Dreyer continued to operate the business, continued to pay his personal bills out of it, and set about a course of conduct designed to conceal the value of that business from the Trustee and from his creditors. The court finds that he knew the status of his business; that he knew the assets of his business and that he knew their value. He just didn't want to reveal them in his schedules to the Trustee and his creditors—and he still would not reveal them when questioned in court under oath. A debtor has a

---

**6.** After his divorce, Mr. Dreyer had no homestead. If he took the federal exemptions under § 522(d)(5) he could claim $3,750.00 of the unused homestead exemption plus the $400.00 wildcard for a total of $4,150.00. There is no other federal exemption for stock or cash. In the exemptions claimed in the April 25, 1990 statements and schedules, Mr. Dreyer listed the stock with an undetermined value, but also claimed as exempt $500.00 cash on hand and $500.00 on deposit with banks; thus to be claimed exempt, the stock would have to have had a value of less than $3,150.00.

paramount duty to carefully consider all questions posed on his schedules and statement of affairs and see that each question is answered completely in all respects. *Friedman v. Sofro (In re Sofro)*, 110 B.R. 989 (Bankr.S.D.Fla.1990).

Ralph Dreyer stated that he was aware there was "confusion" between the assets owned by Mr. Dreyer individually and by the corporation. There is no evidence, however, that Ralph Dreyer took any steps whatsoever (such as securing title reports on property) to straighten out this confusion or to assist the Trustee. Instead he assisted his father in filing deficient schedules. Courts have found debtors' failures to properly amend their schedules reckless indifference to the truth which is the equivalent of fraud. *Sofro, supra,* at 991 (citing *In re Alfonso,* 94 B.R. 777 (Bankr.S.D.Fla. 1988)). The court finds that the Debtor attempted to conceal assets and their value by not disclosing them in his schedules.

### Failure to Keep Records

■ The Trustee and TCB asserted that Mr. Dreyer violated § 727(a)(3) which reads as follows:

(a) The court shall grant the debtor a discharge unless—

. . . .

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

At hearing, his counsel readily admitted that Mr. Dreyer used corporate assets as his own and that he permitted the corporation to use his personal assets as if it owned them. Ralph Dreyer also testified as to the "confusion of assets" between the individual and the corporation. Mr. Rogers testified that when he took over Dreyer Music Company operations the records were in "extreme disarray" and that the files were incomplete. L.J. Barnes, a certified public accountant, prepared tax re-

turns for Mr. Dreyer and the corporation. Mr. Dreyer asserted that Mr. Barnes maintained the corporate records from the sheets turned in daily by the route salesmen and from bank deposit slips. There was no evidence that Mr. Barnes maintained any records of Mr. Dreyer's personal business transactions and Mr. Barnes did not testify on this matter.

For a number of years, Mr. Dreyer listed substantial assets on his personal financial statement. All of these assets except $1,650.00 in cash and his stock in the corporation were conspicuously missing when he presented his January 20, 1990 financial statement to TCB. Despite repeated requests by TCB's attorney both before, during, and after Mr. Dreyer's August 7, 1990 deposition, the disappearance of these assets remains unexplained. A few of the assets are mentioned in the April 25, 1990 statements and schedules, and a small amount of information was produced about some of the insurance policies, but nothing further.

■ While an individual is not required to keep an immaculate set of books and records of his personal financial transactions, a person with personal financial transactions of the scope of Mr. Dreyer's, as reflected by his numerous financial statements, must maintain rudimentary files and copies of notes and correspondence so that the existence or disposition of assets can be ascertained. The Trustee and the creditors are entitled to honest and accurate signposts on the trail showing what property passed through the debtor's hands during the period prior to his bankruptcy. *Guardian Industrial Products, Inc. v. Diodati (In re Diodati)*, 9 B.R. 804 (Bankr.D.Mass.1981).

The court concludes that Mr. Dreyer purposely failed to keep recorded information from which his financial condition and business transactions might be ascertained. Alternatively, if such information was kept, it was not preserved so that the Trustee could determine Mr. Dreyer's financial condition and trace his business transactions. A person with assets as large and business with a volume of Mr. Dreyer's is obligated

to make and preserve such records, and his failure to do so has not been shown to be justified in any way. For this reason Mr. Dreyer's discharge should be denied.

*Withheld Documents From the Trustee*

■ The Trustee and TCB asserted that Mr. Dreyer's discharge should be denied under § 727(a)(4)(D) which provides:

(a) The court shall grant the debtor a discharge unless—

. . . .

(4) the debtor knowingly and fraudulently, in or in connection with the case—

. . . .

(D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs. . . .

■ As indicated above, the court finds that Mr. Dreyer did not maintain books and records concerning his personal financial transactions. In the alternative, if he did maintain such books and records, they were not turned over to the Trustee and § 727(a)(4)(D) was violated. A debtor is under an affirmative duty to assist the Trustee in assembling records. The Trustee is not required to play detective and does not have the resources to do so. *Wendel v. Kent (In re Kent),* 92 B.R. 540 (Bankr.S.D.Fla.1988).

■ Even if Mr. Dreyer did not maintain books or records, he must have held deeds to the property he owned, as well as tax records, life insurance policies and similar information. TCB received some information concerning life insurance policies on the eve of trial. It was too little and too late. There is no evidence that Mr. Dreyer turned any information of any nature whatsoever over to the Trustee, and what little information was given to TCB was given begrudgingly. When a debtor files a bankruptcy petition, he is required to literally open all his records for the trustee's inspection. The court need not grant a discharge to a debtor who withholds information relating to his property or financial affairs. A debtor's cooperation is a prerequisite to

granting a discharge. *In re McDonald,* 25 B.R. 186 (Bankr.N.D.Ohio 1982). The court finds that Mr. Dreyer's failure to give complete financial information to the Trustee was knowing and fraudulent. The court finds that Mr. Dreyer's discharge should be denied under § 727(a)(4)(D).

*False Oath*

■ The Trustee and TCB asserted that Mr. Dreyer's discharge should be denied under § 727(a)(4)(A) which reads as follows:

(a) The court shall grant the debtor a discharge unless—

. . . .

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account. . . .

Congress enacted § 727(a)(4)(A) to ensure that debtors supplied dependable information on which they can rely in administering the bankruptcy estate. *In re Tabibian,* 289 F.2d 793, 797 (2nd Cir.1961). Mr. Dreyer signed the petition, statements, and schedules filed on March 6, 1990 and the amended statements and schedules on April 25, 1990, under penalty of perjury. His action constituted an oath in a bankruptcy proceeding. Taken as a whole, both the statements and the schedules were evasive and constituted an attempt by Mr. Dreyer to conceal his true financial situation. The court finds that listing the value of the corporate stock as "undetermined" in both schedules constituted a fraudulent attempt to mislead the Trustee as to the value of the corporation.

In both schedules, Dreyer listed his sole income as $334.00 per month from Social Security. Mr. Dreyer stated that he did not draw a salary from the corporation during the first part of 1990. However, he testified that he paid his personal living expenses from corporate funds during that time. He made no mention of those withdrawals anywhere in his statement of income. The court finds that his failure to disclose that income constituted a false oath.

In both schedules, Dreyer listed his 1989 income from the corporation at $12,000.00. Upon analysis, this is an obvious falsehood because his expenses exceeded $38,000.00 and his Social Security totaled only $4,008.00 per year. His testimony indicated that the difference between his Social Security income and his total expenses came from business proceeds, so his actual draws from the business were really closer to $34,000.00 than to $12,000.00. The falsity of this statement is further evidenced by his 1989 Federal Income Tax Return which showed that he received $22,400.00 from the corporation. This is supported by a W-2 form from the corporation in that amount. Interestingly, the financial statement which he gave TCB on January 20, 1990 showed his salary at $55,000.00. Mr. Dreyer's signature on the financial statement appeared immediately under the following language: "The undersigned certifies that the information inserted on each side hereof has been carefully read and is true and correct." The court finds that Mr. Dreyer knowingly and fraudulently understated his income from the corporation as part of a scheme to convince the Trustee that the corporation had no value.

Both sets of schedules omitted a number of significant assets and liabilities. The court will discuss some of the omissions. In early March, 1990, just prior to filing bankruptcy, Mr. Dreyer borrowed $20,000 from the State National Bank of Big Spring, Texas. He could not recall whether the note was a personal note or a corporate note. If it was a corporate note, he stated he would have signed a personal guaranty on it. In either event, this debt should have been shown on Mr. Dreyer's schedules; it was not. The obvious purpose in failing to list the State National Bank of Big Spring was to conceal the bankruptcy from that creditor. Indeed, Mr. Dreyer borrowed additional funds from that creditor post-petition. Mr. Dreyer testified that he used the proceeds of the March note to pay off two $5,000.00 notes to his accountant, L.J. Barnes, and that he put the balance into the corporate bank account. Question 11–a of the statement of financial affairs asked the Debtor to describe payment of loans, installment purchases and other debts made during the year preceding the filing of the petition. The payments to Mr. Barnes were not disclosed, nor was any debt to Mr. Barnes disclosed in the schedules.

The schedules did not reveal an obligation for alimony to Ella Frances Dreyer, Mr. Dreyer's former wife. They did not reveal a note dated August 2, 1988 payable to Ms. Dreyer in the amount of $53,672.13, nor the mineral estate in 191.04 acres of land in Tom Green County, Texas, which secured the note. Ralph Dreyer was Trustee under a deed of trust for the benefit of his mother. The evidence does not reflect when Ralph Dreyer resigned and Raymond Chvojka was appointed substitute Trustee. Mr. Chvojka was a former employee of the corporation and the schedules listed him as a creditor for $30,000.00. In a substitute Trustee's deed dated October 5, 1990 Mr. Chvojka stated that he foreclosed on the mineral estate at 10:00 a.m. on October 2, 1990, and that the purchaser was Ella Frances Dreyer for "$10.00 and other good and valuable consideration." The notary who took Mr. Chvojka's acknowledgment was the secretary in Ralph Dreyer's office. No motion to relieve the automatic stay was filed. At the time, Ralph Dreyer was attorney of record for Mr. Dreyer and he had an obligation to notify the parties of the existence of the bankruptcy and to advise the Trustee of the impending property sale. Ralph Dreyer acknowledged that he was aware of the impending foreclosure, but that he took no action.

The schedules did not reveal Mr. Dreyer's ownership of a 1970 Mercedes 240–D automobile which he purchased in late 1987 with financing from the City National Bank of San Angelo. Evidence showed the title was in Mr. Dreyer's name. In late December, 1987 he arranged with Ralph Dreyer for the corporation to pay the car note and insurance, but Ralph Dreyer would have use of the car and would pay any required maintenance. After two years, title was to be transferred to Ralph Dreyer. Ralph Dreyer agreed to accept the car on that basis as payment for his services to the

corporation for the next two years. He performed substantial services for the corporation during that time. His files reflected that he handled 19 suits and 18 other matters. The only payment he received from the corporation was reimbursement for out of pocket expenses.[7] Subsequently Mr. Dreyer repledged the car in connection with other obligations. Later the vehicle was wrecked and it is presently in Austin, Texas. The title remained in Mr. Dreyer. The schedules should have revealed either Mr. Dreyer's ownership of this vehicle or that he was holding it for Ralph Dreyer. Mr. Dreyer asserted that it was improper for him to list ownership of the Mercedes in his schedules because Ralph had earned the Mercedes. Question 6 in both statements of affairs, asks "What Property Do You Hold For Any Other Person?" Both times Mr. Dreyer answered "None."

Various financial statements admitted at trial listed a note receivable which is referred to as "the Ramada Inn note." It was listed as executed in 1977 in the amount of $50,000.00 and as payable on demand. It appeared on all financial statements introduced into evidence except the January 20, 1990 statement. The note is not mentioned in the statements and schedules. Mr. Dreyer testified that the note was charged off in 1987 or 1988 when the building was destroyed. However, he did not turn the note over to the Trustee, nor did he produce any evidence that it had been charged off. The court finds that Dreyer's failure to mention this note in the statements of affairs and schedules was an intentional and fraudulent omission, particularly in view of the fact that the note was listed as an asset on the January 9, 1990 financial statement.

██ Mr. Dreyer did not schedule a pending worker's compensation claim arising out of a 1987 automobile accident. The Trustee discovered the claim only when he received correspondence concerning a $15,-000.00 settlement. Once the Trustee became aware of the worker's compensation settlement, Mr. Dreyer amended his schedules to claim it as exempt. Mr. Dreyer's excuse for not listing it is that he did not think it had any value at the time the petition was filed. The court finds that his failure to list this claim was intentional and fraudulent. In addition, Mr. Dreyer acknowledged he was aware at the time the petition was filed that he had redemption rights in certain lots which had been foreclosed upon at a tax sale. He did not schedule those redemption rights. If a debtor is uncertain as to whether certain assets are legally required to be included in his petition, it is his duty to disclose the assets so that any questions may be resolved. *Butler v. Ingle (In re Ingle)*, 70 B.R. 979 (Bankr.E.D.N.C.1987). The foregoing omissions clearly reflect that Mr. Dreyer made false oaths when he signed both sets of statements and schedules. For that reason his discharge should be denied.

██ Mr. Dreyer testified that he relied on Ralph Dreyer to prepare the schedules and that he simply signed what Ralph Dreyer prepared. A debtor's reliance on advice of counsel constitutes an excuse for his transfer or concealment of property from creditors and will prevent the court from denying his discharge only where his reliance is reasonable and in good faith. *American Savings & Loan Ass'n v. Weber (In re Weber)*, 99 B.R. 1001, 1018 (Bankr.D. Utah 1989). This argument cannot be sustained for two reasons. First, Mr. Dreyer declared under penalty of perjury that he had read the statements and schedules and that they were true and correct to the best of his knowledge, information, and belief. Therefore, he must accept responsibility for the information in the statements and schedules. Second, Ralph Dreyer testified that he and his father had talked about filing bankruptcy during the first part of 1990 and that they met in his office early in the morning of March 6 to prepare the petition, statements, and schedules. Mr.

---

**7.** Ralph Dreyer stated that he had not shown the use of this car as income on his income tax returns because he had not received any cash.

Dreyer took an active part in preparing the schedules. A debtor who signed a petition and schedules under oath and penalty of perjury, but who intentionally failed to list numerous assets of substantial value and transactions with which he was intimately familiar is not entitled to a discharge because he made false oaths in the petition. *Sofro, supra* at 992.

### Failure to Satisfactorily Explain Loss of Assets

 The Trustee and TCB asserted that Mr. Dreyer's discharge should be denied under § 727(a)(5) which reads as follows:

(a) The court shall grant the debtor a discharge unless—

. . . .

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities. . . .

As previously noted, for a number of years Mr. Dreyer's personal financial statements, including the statement of January 9, 1990, showed substantial assets. However, most of those assets disappeared when he prepared his January 20, 1990 financial statement. When questioned about them Mr. Dreyer testified only in vague generalities about exchanging insurance policies and writing off the Ramada note. He offered no specific dates, nor did he give the details of any transaction. He furnished no documentation to substantiate his statements. When questioned about these assets his most consistent answer was "I don't know." These explanations were not convincing to the court which finds that Mr. Dreyer's testimony is not credible. The court finds that Mr. Dreyer knew what his assets were and what happened to them. The court finds Mr. Dreyer was not forthright in his explanations to TCB, to the Trustee and to the court and that Mr. Dreyer failed to satisfactorily explain the precipitous decline of his assets and the deficiency of his assets to meet his liabilities. For that reason his discharge should be denied.

### Refusal to Obey an Order

 The Bank and the Trustee asserted that the Debtor should be denied a discharge under § 727(a)(6)(A) which reads as follows:

(a) The court shall grant the debtor a discharge unless—

. . . .

(6) the debtor has refused, in the case—

(A) to obey any lawful order of the court, other than an order to respond to a material question or to testify . . .

The court scheduled a hearing on August 29, 1990 on the objection to exemptions filed by TCB and the Trustee. When the case was called, Ralph Dreyer appeared on behalf of Mr. Dreyer, the Trustee appeared and the attorney for TCB appeared. They announced that they had reached agreement. The following is excerpted from the transcript of that hearing:

Mr. Pfluger: We have objected to all of the exemptions claimed because they did not specify by what right they were claimed, and I think the agreement is that as to all those matters the Debtor will waive his exemptions, or waive any claim of exemptions, and the court will be permitted to enter a turnover order for all that property today.

The Court: Is that your understanding of the agreement, Mr. Dreyer?

Mr. Dreyer: Yes, it is. And we've agreed to supply addition (sic) information to Texas Commerce Bank by next Tuesday.[8]

. . . .

Mr. Pfluger: The agreement goes to not only the corporate stock but all the corporate assets, because Mr. Dreyer owns a hundred percent of the stock. We're talking about a corporation which has numerous assets scattered across three or four different cities. And we're also talking about assets in the form of life insurance policies which, on those assets, Mr. Dreyer has—has agreed to furnish me additional information to supplement

---

**8.** Tr. p. 4, l. 4–15.

the discovery request which I made in the case by next Tuesday.

The Court: Well, I assumed that Mr. Olen Dreyer owns all of the stock in this particular corporation; is that right?

Mr. Dreyer: That's correct.

The Court: And the stock is going to be turned over to the Trustee?

Mr. Morton: There is no stock.

Mr. Dreyer: There are no certificates, as such.

The Court: All Right. Okay. But then the Trustee owns whatever is—belongs to the corporation, and it—and I assume Mr. Olen Dreyer will agree to not interfere with the Trustee getting possession of those items.

Mr. Dreyer: No.[9]

As a result of that agreement on October 10, 1990 the parties submitted an order to the court approved as to form by the Trustee and TCB's attorney. Ralph Dreyer did not approve the form of the order. The order specified that within ten days the Debtor would produce a $1 million life insurance policy with Alliance Life Insurance Company, the life insurance policies listed on the Debtor's personal financial statement dated February 14, 1986 given to the Bank (four policies having a cash surrender value of $172,000.00) and 16 life insurance policies which were paid by drafts through Mr. Dreyer's personal bank account. The Clerk entered the order on October 22, 1990. No motion for rehearing or appeal was filed with respect to that order and it is final.

Mr. Dreyer did not furnish the information required by that order on the Tuesday following August 29, 1990 in spite of his attorney's promise to do so in open court. Mr. Dreyer did not furnish the information required by that order within ten days from the entry of the order, and there was no evidence that Mr. Dreyer ever complied with the order in any respect. Debtors are required to furnish information concerning their business transactions and their financial affairs, including information concerning their life insurance policies. The order to furnish such information was lawful and Mr. Dreyer did not comply with it. Therefore, his discharge should be denied for failure to obey a lawful order of the court.

### Conclusion

For the reasons stated in this opinion, Olen Dreyer's discharge will be denied.

DATED: May 24, 1991 [10].

---

9. Tr. p. 5, l. 5–p. 6, l. 4.

10. This Memorandum shall constitute Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rule 7052.