**ITT COMMERCIAL FINANCE CORP., Plaintiff,**

v.

**Philip A. WALZ, Jr. f/d/b/a Walz Mobile Home Sales & Hilary Walz, Defendants.**

**Bankruptcy No. 89–9060 (89–07072).**

United States Bankruptcy Court, N.D. Florida, Tallahassee Division.

May 7, 1990.

---

William B. Graham, Tallahassee, Fla., for plaintiff.

Bill A. Corbin, Tallahassee, Fla., for defendants.

T. Whitney Strickland, Tallahassee, Fla., Trustee.

## MEMORANDUM OF OPINION

LEWIS M. KILLIAN, Jr., Bankruptcy Judge.

THIS CAUSE came on for trial on February 7, 1990, on the Plaintiff's complaint seeking an exception to discharge pursuant to § 523(a)(2)(B) of the Bankruptcy Code and denial of the debtors' discharge pursuant to § 727(a)(5) of the Bankruptcy Code.[1] The plaintiff, ITT Commercial Finance Corporation claims that the debtor, formerly a mobile home dealer, obtained an extension of credit through use of a false financial statement and that he has failed to satisfactorily explain the loss of his assets. We disagree and find that the debtor is entitled to discharge and that the claim of ITT should not be excepted from discharge. Having reviewed the pleadings, considered all evidence presented at trial and the written arguments of counsel following trial, we hereby make the following findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052.

In 1984, Walz approached ITT for the purpose of obtaining financing for a mobile home sales business. In August of 1984, Walz[2] and ITT entered into a floorplan finance agreement under which ITT advanced a $100,000 line of credit. Pursuant

---

1. The complaint was dismissed as to Hilary Walz at the conclusion of the trial.

2. The floorplan agreement was in the name of Walz Mobile Home Sales and guaranteed by Philip and Hilary Walz. However, Walz Mobile Home Sales was not a separate legal entity, rather it was merely the name under which Philip Walz did business.

to the floorplan agreement, ITT advanced money to various mobile home manufacturers who then delivered the homes to Walz's sales lot. ITT retained a lien on the various homes and with each retail sale, Walz was to pay to ITT the principal balance due on the unit sold. Interest was to be paid monthly.

Originally when Walz applied for the credit, he was required and did supply to ITT various credit documents to include a business financial statement, a personal financial statement, references and a statement of his experience in the industry. Walz was required by ITT's policies to periodically update his credit file and in 1985 and 1986 he did in fact supply ITT with updated financial statements. None of these financial statements are alleged to be fraudulent in the instant case. In 1985 Walz's credit line was extended to $200,-000. In connections with these extensions of credit, ITT ran a credit check, verified various of the assets and checked Walz's trade references. In addition to Walz's own financial strength, testimony of Barbara Todd, an account manager with ITT, demonstrated that ITT relied greatly on the relationship of the dealer with certain strong mobile home manufacturers whose homes ITT was financing.

From the inception of the arrangement until 1987, the relationship between Walz and ITT was good with no real problems. Two things however changed this during the 1986–87 time frame. In 1985, Walz apparently decided that he was going to get out of the mobile home sales business and agreed with a gentlemen named Ken Craddock to sell Walz Mobile Home Sales to Craddock. On October 4, 1985, Craddock paid $5,000 to Walz which was supposedly a down payment against a $40,000 purchase price for the business. Walz remained in business in Tallahassee while Craddock went to Ft. Myers, Florida and opened up a sales location in the name of Walz Mobile Home Sales there. Craddock was unable to obtain his own floorplan financing arrangements at that location and accordingly he operated the Ft. Myers location utilizing Walz's floorplan arrangement with ITT. Using Walz's floorplan,

Craddock operated basically on his own dealing directly with ITT with regard to purchasing mobile home units and making the payments. At the same time, Walz continued to operate in Tallahassee however he was basically liquidating the inventory he had in Tallahassee and did not add any further inventory to his floorplan. Thus, Craddock's operation in Ft. Myers became Walz Mobile Home Sales. The only time Walz individually became involved would be when ITT had payment problems with Craddock at which time ITT would contact Walz who would then straighten out the problems.

The second major event which precipitated the financial problems between Walz (and Craddock) and ITT was the fact that during that time frame a number of the primary manufacturers of mobile homes from which Walz had purchased homes under his floorplan filed bankruptcy. These bankruptcy filings resulted in a significant decrease in the marketability of homes already on the sales lots and caused Walz to incur additional expenses in setups and repairs which would ordinarily been handled by the manufacturers. Consequently, a number of homes sat on Craddock's Ft. Myers lot past the one year for which ITT agreed to finance under the floorplan, and problems occurred with financing arrangements once some homes were sold. The debt claimed by ITT to be nondischargeable resulted from several units having been sold by Craddock for which payment was not remitted to ITT and from other charges which accrued on the account primarily due to the inability to move old units off the sales lots. With regards to the units sold and not paid for, there was no allegation that Walz or Craddock had actually taken the payments and improperly diverted them for their own use. Apparently, a significant amount of the proceeds was used merely to cover those items which should have been taken care by the bankrupt manufacturers and were required to be performed prior to permanent financing being extended to the purchasers of those units.

As previously stated, the relationship between Walz and ITT remained good through 1986. However, during 1987 the foregoing factors began to create significant problems with respect to Craddock's operation. In February of 1987, credit to Walz Mobile Home Sales was suspended after ITT received payments for some units sold by Craddock with nonsufficient funds checks. The credit was reinstated on August 20, 1987, at the $150,000 level on the basis of a workout negotiated between Walz and ITT to bring the account current. Once again in November in 1987 credit was suspended based on NSF checks from Craddock's location. At that time, the credit with Walz Mobile Homes was terminated by ITT. Eventually, ITT repossessed remaining inventory and sold it back to manufacturers under repurchase agreements.

At some time during the problems in 1987, the financial statement which ITT claims was fraudulent was received by ITT. As previously noted, ITT received only a photocopy of the financial statement and not an original bearing an original signature. Furthermore, it was not given to ITT by Walz but was apparently given by Craddock. There was no testimony presented by ITT regarding when the financial statement was received by them or what relationship the receipt of that financial statement had to any of their business decisions and actions regarding the account. In sum, there was no evidence that ITT actually did anything in reliance on that financial statement.

With respect to ITT's objection to Walz receiving a discharge pursuant to § 727(a)(5) of the Bankruptcy Code, ITT points to differences between the April 30, 1987 financial statement which it claims to be fraudulent and the bankruptcy schedules filed in this case in March of 1989. ITT alleges that Walz showed on his 1987 financial statement that he had real estate valued at $115,000 that was valued at $67,000 in the bankruptcy petition, personal possessions valued at $35,000 which were valued at $713 in the bankruptcy petition, a boat, motor, and trailer, mobile home, four (4) grave plots, and investments in a proprietorship valued at a total of $189,136 which are not scheduled at all in the bankruptcy petition.

With respect to the real estate, Walz testified that the real estate listed was his homestead and that the 1987 value was based on his opinion of the value considering the neighborhood in which it was located and the quality of the construction of the home which he took part in himself. However, property values in the neighborhood were adversely affected when a rental project was constructed nearby and his efforts to sell the property at much lower values were unsuccessful. Finally, and without obtaining an appraisal, he listed the value of his property at the assessed value on the county tax rolls.

With respect to his personal possessions which had been valued at $35,000, Walz testified that he had sold most of that property to raise money to attempt to pay ITT. No evidence was presented to contradict this explanation. The $169,000 for the proprietorship included all of the personal property of the business and its goodwill. Included in that was inventory and equipment, virtually all of which was either sold with ITT receiving the proceeds in the case of inventory, or sold and the proceeds used to pay for warranty service work on homes whose manufacturers had gone out of business. Several of the items of personal property owned by the business to include the mobile home toters were sold to Ken Craddock for use in his operation.

With respect to other items listed on the financial statement by Walz, including a 1981 Cadillac and a 1981 mobile home, those items were sold at liquidation prices in order to obtain funds to make payments to some creditors, including ITT. The boat, motor and trailer rig were likewise sold at reduced price because of its poor condition. No evidence was presented by ITT to contradict any of the foregoing explanations given by Walz with regard to the differences between his April 1987 financial statement and his 1989 bankruptcy schedules.

In order to accomplish the purposes of the relief provisions of the bankruptcy code, exceptions to dischargeability of debts are to be strictly construed and the burden is on the creditor to prove the exception by clear and convincing evidence. *In re Hunter,* 780 F.2d 1577 (11th Cir. 1986). In order to prevail under complaint of non-dischargeability pursuant to 11 U.S.C. § 523(a)(2)(B), the plaintiff must prove the following six elements:

1) A debt for obtaining money;

2) By use of a statement in writing;

3) That is materially false;

4) Respecting the debtor's financial condition;

5) On which the debtor reasonably relies; and

6) Published with the intent to deceive.

*Matter of Sawyer,* 76 B.R. 201, 203 (Bankr. M.D.Fla.1987); *In re Coughlin,* 27 B.R. 632, 635 (Bankr. Appellate 1st Cir.1983). In the instant case, the plaintiff ITT has failed to meet its burden of proof with respect to several of the foregoing elements. First of all, it has failed to prove the amount, if any, of the claim which it asserts to be nondischargeable which was incurred after it received the allegedly false financial statement. Thus, it is not proven that this debtor either obtained money or an extension of credit as a result of the statement. Secondly, plaintiff presented absolutely no evidence of any reliance on the 1987 financial statements which reliance resulted in any advances of money or extensions of credit. Finally, plaintiff has failed to present clear and convincing evidence that the financial statements were materially false at the time they were prepared or that they were published with the intent to deceive anybody. The only evidence to substantiate the allegation of material falsity was the difference in values listed on the financial statement in 1987 and the values set forth in the debtor's bankruptcy petition in 1989. However, no evidence was presented to prove that these discrepancies were the result of falsification rather than the result of differing valuation methods and dissipation of assets due to the failure of the business during 1987 and 1988. Accordingly, the claim of ITT will not be excepted from discharge.

In order for ITT to succeed in obtaining a denial of discharge pursuant to 11 U.S.C. § 727(a)(5), it must prove that Walz at one time owned a substantial identifiable asset and that the asset is no longer available to the debtor's creditors. *In re Sklarin,* 69 B.R. 949 (Bankr.S.D.Fla.1987). Once a showing of lost assets has been made, the burden shifts to the debtor to explain the loss to the court's satisfaction. *Id.* A satisfactory explanation requires the debtor to demonstrate good faith in the conduct of his affairs and in explaining the loss of assets. *In re Cohen,* 47 B.R. 871 (Bankr.S.D.Fla.1985).

As previously noted, a considerable discrepancy existed between the value of Walz's assets as set forth in the 1987 financial statement and in his bankruptcy schedules. ITT argues that Walz has failed to adequately explain the loss of his investment in his proprietorship or the value of Walz Mobile Home Sales. However, ITT has at the outset failed to prove that Walz ever did have the assets with the value it alleges in its § 727(a)(5) claim. On one hand, ITT complains that Walz fraudulently misrepresented the value of those assets in the 1987 statement and then turns around and argues that the assets were in fact there but have now been dissipated without satisfactory explanation. Based on the evidence presented, we are not satisfied by clear and convincing evidence that Walz had assets with the values as set forth in the financial statements. Furthermore, we find the explanation given by Walz as to the diminution of his assets between 1987 and 1989 to be reasonable. Much of the value given was tied up in Walz's businesses which failed during 1987 and 1988 due to the factors set forth herein. He testified that he liquidated the hard assets of those businesses at distressed sales prices to satisfy creditors. Any going concern value which the businesses may have had in early 1987 would no longer be present since the businesses no longer exist. Accordingly, we find that ITT has

**358**

failed to carry its burden of proof under § 727(a)(5) and the debtor will not be denied discharge.

A separate final judgment will be entered in accordance herewith.

DONE AND ORDERED.