**In re William MARTIN, Sr., Debtor.**

**BAY STATE MILLING COMPANY, a Minnesota corporation, Plaintiff,**

v.

**William MARTIN, Sr., Defendant.**

**Bankruptcy No. 89 B 9796.**
**Adv. No. 90 A 1003.**

United States Bankruptcy Court,
N.D. Illinois, E.D.

May 18, 1992.

See also 130 B.R. 930.

**988**

Paul M. Bauch, David D. Cleary, Bell, Boyd & Lloyd, Chicago, Ill., for plaintiff.

Bernard M. Kaplan, Ruben, Kaplan & Rosen, Skokie, Ill., for defendant.

Michael S. Polsky, Trebon & Polsky, Milwaukee, Wis.

Karen Moore, Office of the U.S. Trustee, Chicago, Ill.

Douglas Lipke, Rudnick & Wolfe, Chicago, Ill.

Catherine Steege, David Neff, Jenner & Block, Chicago, Ill.

David A. Kallick, Leanne M. Swenson, Hurley & Kallick, Ltd., Deerfield, Ill., for LaSalle Bank Northbrook.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER, Bankruptcy Judge.

This Adversary case is related to the bankruptcy proceeding filed by the debtor William Martin Sr. ("Martin"). It was originally filed on June 13, 1989, under Chapter 11 of the Bankruptcy Code, but later converted to a proceeding under Chapter 7. The plaintiff Bay State Milling Company ("plaintiff" or "Bay State") filed this Adversary case to bar Martin's discharge pursuant to 11 U.S.C. § 727. Originally filed in seven counts, Counts III and VII were dismissed prior to trial on plaintiff's motion.

For reasons set forth below, judgment is by separate Order entered in favor of defendant on Counts I, II, IV and V, and judgment deferred on Count VI pending trial of another related Adversary case and the evidence to be heard in that trial.

These are the counts that went to trial:

*Count I—11 U.S.C. § 727(a)(2)(B): Asserted Transfer and Concealment of Loan Repayments that are Property of the Estate*

Martin's wife, June Martin, allegedly received monthly repayments of a loan previously made to Country Maid, in which Martin has at least a 50% interest (the "Loan"). Such proceeds from the repayment of the Loan are asserted to have been property of the estate. Martin is said to have transferred his interest in such loan proceeds to his wife and attempted to conceal the transfer by having Country Maid make payments solely to his wife after he filed in bankruptcy.

Bay State accuses Martin of hiding such transfers and payments and engaging in such concealment with intent to hinder, delay, or defraud creditors of his estate and the Trustee.

Martin denies that he transferred to his wife his interest in the Loan proceeds due from Country Maid, or that any payments made to his wife by Country Maid were made with intent to hinder, delay, or defraud creditors of his estate and the Trustee.

*Count II—11 U.S.C. § 727(a)(2)(B): Asserted Transfer and Concealment of Assets of National Flour Company of Illinois*

Martin owns 100% of the outstanding shares of National Flour Company of Illinois ("National Flour"). After commencement of his bankruptcy case, Martin assertedly caused the transfer of essentially all National Flour assets to Central Baking

Supply, which now operates essentially the same business as National Flour and now services many of National Flour's clients. Central Baking Supply, which is owned by Martin's son, assertedly paid inadequate consideration for the assets allegedly transferred.

Plaintiff contends that this transaction increased the amount of claims against the estate by transferring assets that could have satisfied creditor claims against National Flour upon which Martin was a guarantor. Martin is accused of making such transfers and engaging in such concealment with the intent to hinder, delay, or defraud creditors of his estate and the Trustee.

Martin denied that he caused the transfer of National Flour assets to Central Baking Supply without adequate consideration, or that any transfer was made with intent to hinder, delay, or defraud creditors of his estate and the Trustee.

### Count IV—11 U.S.C. § 727(a)(3): Asserted Failure to Maintain Adequate Records

This Court appointed an Examiner to investigate Martin's financial affairs. The Examiner's report revealed many weaknesses in Martin's records and accounts. Based upon the Examiner's conclusions, this Court converted the case to a Chapter 7 liquidation case and appointed a trustee. In light of the Examiner's findings and conclusions, it is alleged that Martin knowingly and fraudulently concealed, destroyed, mutilated, falsified, or failed to keep or preserve adequate recorded information, including books, documents, records, and papers, from which Martin's financial condition or business transactions might be ascertained.

Martin disputes and denies these charges.

### Count V—11 U.S.C. § 727(a)(4)(D): Asserted Concealment of Records from the Examiner and Trustee

Throughout the course of this case, Martin has asserted that his financial records and accounts are complete. The Examiner's report concluded that Martin failed to keep or preserve adequate recorded information from which his financial condition or business conditions might be ascertained. Consequently, if Martin's assertion of complete records is true, plaintiff argues that Martin must have knowingly and fraudulently withheld from the Trustee and Examiner books, documents, records, and papers relating to Martin's property or financial affairs.

Martin disputes and denies these charges.

### Count VI—11 U.S.C. § 727(a)(5): Asserted Failure to Explain Diminution of Estate Assets

Martin asserts that the estate is without assets except for stock in Country Maid and National Flour. Martin also asserts that he was solvent and able to pay Bay State the amount indebted at the time of Martin's transfer of stock to his children in June of 1985. Financial statements prepared by Martin in 1987 also reflect a substantial net worth. The Trustee and the Examiner have requested that Martin explain the current deficiency of his assets to meet his current liabilities. Martin is said to have failed to explain satisfactorily any loss of assets or deficiency of assets to meet Martin's liabilities.

Martin disputes and denies these charges.

Following trial before the bench, the Court now makes and enters the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. Martin is an individual who owns 100% of the outstanding shares of National Flour Company of Illinois ("National Flour"), an Illinois corporation. Until October of 1989, National Flour was engaged in the business of wholesale flour distribution. National Flour filed an antitrust suit against Bay State in the United States District Court for the Northern District of Illinois, Eastern Division, which alleges price discrimination in violation of the Clayton Act [15 U.S.C. § 15(a)].

2. When his related bankruptcy case was converted to one under Chapter 7, Martin owned 45% of the outstanding shares of Country Maid Bakery, Inc. ("Country Maid"). His wife has owned 40% of the outstanding shares of Country Maid since the inception of that corporation. Until June 1, 1985, Martin owned 60% of the outstanding shares of Country Maid. Country Maid is a closely held family business engaged in wholesale and retail baked goods production, distribution, and sale.

3. Martin formerly owned 50% of the outstanding shares of National Flour Company of Wisconsin ("Wisconsin"), a Wisconsin corporation. Philip Sylvester ("Sylvester") owned the remaining 50% of said stock. Wisconsin was engaged in the business of wholesale flour distribution. On or about February 1, 1985, Martin sold his interest in Wisconsin to Sylvester. Martin and his wife each also own a 50% interest in a parcel of improved commercial real estate property located in Milwaukee, Wisconsin (the "Warehouse"), and a 50% interest in a loan receivable from Country Maid (the "Loan" referred to in Count I).

4. Bay State is a flour miller and a wholesale distributor of flour and milled grain products. On March 14, 1967, Martin and his wife executed a guarantee of National Flour's obligations to Bay State. On August 10, 1983, Martin and Sylvester executed a guarantee of Wisconsin's obligations to Bay State.

5. After Martin's execution of the Wisconsin guarantee, Bay State shipped goods to Wisconsin on open account. On or about June 1, 1985, Wisconsin owed to Bay State in excess of $400,000 on account. Wisconsin defaulted on its obligations to pay Bay State, and Bay State made demand upon Martin for payment of Wisconsin's account. Martin did not honor his guarantee, asserting that on account of his sale of his interests in Wisconsin he was no longer liable on the Wisconsin guarantee.

6. On June 1, 1985, Martin executed an instrument of gift, transferring to each of his three children 5% of the outstanding shares of stock of Country Maid owned by him, thereby reducing his stock ownership in Country Maid to 45%.

7. In August of 1985, Bay State filed a civil action in the United States District Court for the Eastern District of Wisconsin seeking, *inter alia,* judgment against Wisconsin and against Martin and Sylvester on their Wisconsin guarantee. *Bay State Milling Company v. National Flour Company of Wisconsin, Inc., et al.,* 85–C–1242, 1989 WL 205819 (E.D.Wis.). In this same civil action, Martin's co-defendants, Sylvester and Wisconsin, filed cross-claims against Martin for fraud and conversion.

8. The District Court entered partial summary judgment in favor of Bay State with respect to Martin's liability on the Wisconsin guarantee. The District Court conducted a jury trial to determine the amount of Bay State's damages, and to determine Sylvester's and Wisconsin's claims against Martin. The jury returned the verdict in favor of Bay State, liquidating its claims against Martin, and in favor of Sylvester and Wisconsin on their cross-claims against Martin.

9. On August 17, 1988, the District Court entered judgment pursuant to the jury verdict in favor of Bay State in the amount of $447,528.36; in favor of Sylvester in the amount of $50,000.00 in compensatory damages and $70,025.79 in punitive damages; and in favor of Wisconsin in the amount of $25,998.28. These judgments were subsequently affirmed on appeal by the United States Court of Appeals for the Seventh Circuit.

10. Martin filed his voluntary petition for relief under Chapter 11 of the Code on June 13, 1989.

11. During the administration of the Chapter 11 proceeding, the debtor was ordered to file a plan and disclosure statement containing certain information and to file debtor-in-possession operating reports.

12. Although Martin filed a plan and disclosure statement, he did not comply with the Court's Order regarding information required to be specified within the plan and disclosure statement. Also, Martin did

not file his required debtor-in-possession reports on a timely basis.

13. On March 14, 1990, at the hearing upon the Joint Motion of the Unsecured Creditor's Committee and Bay State Milling Company for appointment of a Chapter 11 trustee, Martin's counsel requested that the Court appoint an Examiner. The Court, therefore, appointed Joseph D'Amico as Examiner to investigate Martin's financial affairs.

14. The preliminary report of the Examiner filed with the Court contended, among other things, that

a. Martin failed to preserve adequate recorded information from which the debtor's financial condition or business transactions might be ascertained.

b. Martin failed to cause Country Maid to retain for an adequate period records of its cash transactions, including the maintenance of cash register tapes. ·

c. Country Maid had an unsatisfactory level of "cash shortages".

d. There were insufficient records of Martin's financial affairs to account for the payment of all his normal living expenses.

e. Martin's personal expenses while he was debtor-in-possession were being paid by Country Maid at the same time the estate was not receiving on his behalf any dividends with respect to his ownership of Country Maid stock.

f. Country Maid maintained a Florida condominium for use of its officers and directors, which did not benefit the interest of the estate as a stockholder.

15. However, the Examiner acknowledged the following in his more recent testimony upon trial of this Adversary case:

a. If the records supplied as to Country Maid were accurate, one could calculate the value of Martin's stock in Country Maid; and

b. The Examiner did not complete any tests as to the accuracy of Country Maid records.

c. He ultimately received materially all of the documents he requested.

16. On May 17, 1990, the Court appointed Sheldon Solow as a Chapter 11 Trustee. The case was converted on August 24, 1990 from a Chapter 11 case to a Chapter 7 case. The Trustee Sheldon Solow, as Chapter 7 Trustee, is in the process of liquidating assets of the debtor Martin.

17. Martin and his wife, June Martin, loaned and advanced to or on behalf of Country Maid diverse sums of money, for which no additional shares of stock in Country Maid were issued. This was done by them over many years of Country Maid's existence prior to debtor's filing in bankruptcy.

18. The monthly payments that Martin or his wife received for a time from Country Maid (generally $1,500 to $2,000) were accepted by them as partial repayment of loan advances previously made by them to or on behalf of Country Maid, and are reflected by checks issued by Country Maid to either Martin or his wife. Those payments have not been concealed.

19. Country Maid is an operating company, not in bankruptcy and not proved to be insolvent.

20. During the entire period mentioned in these Findings, both Martin and his wife were and are still actively rendering personal services in connection with the operations of Country Maid, for which they have generally refrained from drawing salaries.

21. Martin has not, with intent to hinder, delay or defraud any creditors, transferred, removed or concealed:

a. property of the debtor within one year before the filing of the Chapter 11 petition; or

b. property of the estate after the date of the filing of his petition in bankruptcy.

22. Martin has kept or preserved personally and in the Country Maid business recorded information, including books, documents, records, and papers, from which his financial condition and business transactions might be ascertained. Apparent contradictions in Country Maid records concerning the balances due loans from Mr.

and Mrs. Martin were explained by its accountant's adjusting entries.

23. It has not been established that Martin withheld from the Examiner Joseph L. D'Amico, or from the Trustee of the estate, any material books, documents, records, and papers relating to the debtor's property or financial affairs.

24. Further, facts set forth in the Conclusions of Law will stand as additional Findings of Fact. Legal standards set forth in the Findings of Fact will stand as additional Conclusions of Law. Remarks of the Court from the bench at the conclusion of trial will stand as additional Findings of Fact and Conclusions of Law.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Local District Rule 2.33 of the United States District Court for the Northern District of Illinois.

2. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J), seeking to bar discharge of debtor under 11 U.S.C. § 727.

3. Plaintiff's burden under 11 U.S.C. § 727 is to establish all necessary elements by a preponderance of the evidence. *Grogan v. Garner*, —— U.S. ——, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

■■■ 4. Counts I and II state a claim under § 727(a)(2)(B) of the Code which bars discharge in bankruptcy if,

> the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated or concealed any of the debtor's property, or permitting to be transferred, removed, destroyed, mutilated or concealed—property of the estate, after the date of the filing of the petition.

11 U.S.C. § 727(a)(2)(B). To prevail on Counts I and II, plaintiff must establish the following:

> (1) that the act complained of was done after the date of the filing of the petition;

> (2) that the act was done with actual intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under the Bankruptcy Code;

> (3) that the act was that of the debtor or his duly authorized agent; and

> (4) that the act consisted of transferring, removing, destroying or concealing any of the debtor's property, or permitting any of these acts to be done.

*Matter of Agnew*, 818 F.2d 1284, 1287 (7th Cir.1987); 4 *Collier on Bankruptcy* ¶ 727.-02[1][b] (15th Ed.1991).

## *Count I*

5. Martin and his wife, June Martin, are due payments from Country Maid on loans made by them to that company. No documents exist which directly reflect the original loan amounts or current balances due each of the Martins. The Martins received a number of monthly repayments of the Loan in amounts of $1,500 to $2,000. These loan repayments were paid out of a Country Maid account with checks made payable to "W.W. Martin". Bay State Ex. 43(1)–(8). At least $48,000 is still due from Country Maid as a result of advances by the Martins to that business over many years.

6. Loan repayments continued to be made payable to "W.W. Martin" until May 9, 1989. Examiner's Report, Bay State Ex. 33. Approximately one month later, on June 13, 1989, the debtor filed his petition for relief in bankruptcy. On June 6, 1989, just seven days before filing of the debtor's bankruptcy, another check was issued as repayment of the Loan to Country Maid. This time, however, the Loan repayment was made payable to "June Martin." Bay State Ex. 42(1). Several more payments were made to Mrs. Martin after that date. Bay State Exs. 42(1)–(4). Those payments were against the same loans extended by both Mr. and Mrs. Martin prior to bankruptcy. Despite payments from Country Maid to Mr. and Mrs. Martin, at least $24,-000 (that is at least half of the amount still due from Country Maid to the Martins) is

due to him (and therefore to the Trustee) from Country Maid.

7. A debtor's interest in a loan repayment is an investment interest which is property of the estate. 11 U.S.C. § 541(a)(1). Cf. *In re Crysen/Montenay Energy Co.*, 902 F.2d 1098, 1101 (2d Cir. 1990) (right of action to collect accounts receivable is property of the estate); *In re Fitzsimmons*, 725 F.2d 1208 (9th Cir.1984) (proceeds of repayment of any purported loans are investment income which is property of the estate and cannot be used by the debtor for personal expenses); *In re Express America*, 132 B.R. 535, 539 (Bankr.W.D.Pa.1991) (accounts receivable are property of the estate); and *In re Be-Vier*, 12 B.R. 75, 77 (Bankr.D.S.D.1981) (promissory note which named debtors as payees is property of the estate). The debtor failed to list the purported loan repayment as an asset on his Schedule of Assets. Bay State Ex. 6. However, debtor did identify the loan on his Statement of Affairs, and did not attempt to conceal it. His omission in the Schedule was not an attempt to defraud or hinder the creditors from obtaining the proceeds from the loan repayment.

8. Prior to the bankruptcy filing, the loan repayments from Country Maid were made to him to reduce his individual interest in the loan receivables. After the bankruptcy filing, his wife received payments against her portion of the Loan. In December 1989, in connection with Bay State's Motion to Dismiss, both the debtor and his wife testified that the Loan repayments reflected repayment of their joint advances to Country Maid. *In re Martin,* 113 B.R. 949 (Bankr.N.D.Ill.1990). The debtor does not deny that the original advancements comprised a series of loans by him and his wife. Prior to his bankruptcy filing, the loan repayments were used jointly by him and his wife for living expenses. Without the repayment proceeds, Mrs. Martin's income was limited to Social Security payments. The loan repayments supplemented the Social Security. However, the foregoing is not inconsistent with debtor's position that some repayments were to him and some (post-bankruptcy) were to her.

9. Plaintiff argues that the post-bankruptcy payments to Mrs. Martin require denial of the debtor's discharge, citing *In re McMahon,* 116 B.R. 857 (Bankr. M.D.Fla.1990). In *McMahon,* the debtor misappropriated funds out of her parents' probate estate and used part of these funds to purchase a car. While the representative of the probate estate was attempting to recover these funds, the debtor and her husband pledged that car as collateral to receive a $12,000 loan. The couple then lost half of the loan proceeds in a gambling trip to Las Vegas, and transferred the remainder into an account maintained solely in the name of her husband. The evidence in *McMahon* clearly established that debtor there transferred her half interest in the remaining loan proceeds to her husband solely to protect funds from creditor. Thus, the court found that a denial of discharge was warranted. *Id.* at 861. This case is clearly distinguishable from *McMahon* because the plaintiff did not establish that Martin engaged in an intentional plan to shield the loan repayments from his creditors or from the Chapter 7 Trustee, or that in fact he transferred or assigned any part of his loan repayment rights to his wife.

10. Payments to Mrs. Martin (who did not file in bankruptcy) repaid part of her loan to Country Maid. Those payments did not affect amounts due from Country Maid to debtor. Payments to Mrs. Martin did not conceal or transfer monies due to Mr. Martin. The fact that they each used monies received and their cash flow for joint expenses does not indicate fraudulent intent. Such conduct is common among many married people, and is hardly a badge of fraud. Moreover, from the evidence it appears that available records permit a calculation of debt owed Mr. Martin from Country Maid. Unlike *McMahon,* the plaintiff in this case has not proved by a preponderance of the evidence that Martin acted to conceal the loan repayments due from him or received (either by him prior to

bankruptcy or by his wife following his filing) from Country Maid.

### Count II

11. The debtor incorporated National Flour in 1963. Although still a corporate entity, National Flour ceased operations in October of 1990. The debtor caused it to transfer substantially all its assets to his son, William Martin, Jr., after filing of his bankruptcy case. The debtor's son used the assets to form a competing company, Central Baking Supply.

12. At the time of the transfer, National Flour was indebted to a secured lender, Uni–Fin, in an amount exceeding $200,000. Both Martin and his wife had personally guaranteed National Flour's debt to Uni–Fin.

13. As part of the National Flour transaction with debtor's son, Central Baking Supply agreed to pay $14,316 for the inventory. Aside from payment of an initial $5,400, Central Baking Supply has not made any other payment to National Flour. The outstanding balance remains due in the amount of $8,751.08. Bay State Ex. 35. Central Baking Supply did not give any additional consideration for other tangible and intangible assets of National Flour. Central Baking Supply received, and continues to use, National Flour's client list and telephone number. It also leases the former office space of National Flour.

14. Plaintiff argues that debtor's transfer of National Flour's assets, in which the debtor is a 100% shareholder, increased the amount of claims against the debtor's estate, and that assets transferred could have satisfied the outstanding amount due to National Flour's secured creditor, Uni–Fin, thereby leaving remaining assets for distribution to debtor's estate.

15. (a) Several facts are clear: First, National Flour's transferred assets cannot be valued based on evidence at trial, and it cannot be found from evidence presented that those assets were worth more than what was paid or agreed to be paid by debtor's son. Second, the National Flour assets that were sold were not assets of this estate; only the common stock in that company was owned by debtor. Therefore, the issue here is whether plaintiff proved that Mr. Martin impaired, concealed, or transferred the value of that common stock. Since there was no evidence as to the value of that stock either before or after the asset transfer, plaintiff failed to prove that the value of debtor's stock in National Flour was impaired or concealed. Exhibit 19A showed that National Flour had $116,000 in capital in 1988, but the evidence also established that its business operations became minimal after Mr. Martin filed in bankruptcy and no longer did any business through National Flour. The reported showing of $116,000 in capital in 1988 does not establish value of debtor's National Flour stock at the time he caused National Flour property to be sold to his son.[1]

(b) In short, transfer of assets from a moribund company did not necessarily impair the value of common stock in that company which might well have been valueless before the asset transfer. Therefore, plaintiff has not shown by preponderance of evidence that debtor's agreement to sell such assets to his son was made to conceal those assets from the debtor's estate or with intent to hinder, delay, or defraud creditors of the estate.

(c) Some troublesome questions remain. What happened to the $5,400 that National Flour received from Central Baking? Was it received and disposed of by debtor? If so, was that before or after the Trustee was appointed? If afterward, was the Trustee entitled to that fund? The evidence does not answer these questions. Plaintiff has not yet established that debtor should have given the $5,400 to the Trustee or that he hid it from the Trustee. It may be that this matter will be revisited in the remaining trial as to Count VI.

---

1. Plaintiff has pointed out that the son did not pay the full price. If that is so, nothing prevented the Trustee who obtained the common stock in National Flour from pressing his claim for any balance due. The Trustee has not done so before this Court, nor has the Trustee sought to set aside the sale of assets.

*Count IV*

16. Under § 727(a)(3) of the Bankruptcy Code, discharge will be denied when,

the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions may be ascertained, unless such act or failure to act was justified under all the circumstances of the case.

11 U.S.C. § 727(a)(3). To prevail on Count IV, plaintiff must prove that debtor failed to keep adequate records. *In re Wiess*, 132 B.R. 588, 592 (Bankr.E.D.Ark.1991); *In re Calisoff*, 92 B.R. 346, 356 (Bankr.N.D.Ill. 1988). Records are not "adequate" if they do not provide the trustee or creditors with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present. *Matter of Watson*, 122 B.R. 476, 480 (Bankr.M.D.Ga.1990); *Calisoff*, 92 B.R. at 356, citing *In re Reitz*, 69 B.R. 192, 197 (Bankr.N.D.Ill.1986). In determining whether a discharge should be denied on grounds that debtor failed to keep or preserve financial information, the type of information that debtor is required to keep is a function of the financial circumstance; the more complex the debtor's financial situation, the more detailed the debtor's records are expected to be. *In re Martin*, 124 B.R. 542 (Bankr.N.D.Ind.1991); *In re Sullivan*, 111 B.R. 317, 321 (Bankr.D.Mont. 1990). The plaintiff does not need to prove that the debtor intended to defraud the creditors to prevail under § 727(a)(3). *Calisoff*, 92 B.R. at 356.

17. Substantially accurate and complete records of a debtor's financial affairs is a prerequisite to discharge in bankruptcy. *In re Ridley*, 115 B.R. 731, 735 (Bankr. D.Mass.1990); *In re Bucci*, 103 B.R. 927 (N.D.Ill.1989) *aff'd Cohen v. Bucci*, 905 F.2d 1111 (7th Cir.1990); *In re Potter*, 88 B.R. 843 (Bankr.N.D.Ill.1988). Without these records, creditors have no way to ensure the honesty of debtors in bankruptcy. The reasons for denying debtor a discharge in bankruptcy based on failure to maintain adequate financial records are to ensure that the Chapter 7 Trustee and creditors receive adequate information to enable them to trace debtor's financial history; to ascertain the debtor's financial condition; and to reconstruct the debtor's financial transactions. *In re Dreyer*, 127 B.R. 587, 594 (Bankr.N.D.Tex.1991); *In re Goldstein*, 123 B.R. 514, 521–23 (Bankr. E.D.Pa.1991).

18. Martin and his wife extended significant personal loans to Country Maid during the early years of Country Maid's existence. Martin contends that the loans to Country Maid exceeded $260,000, though that contention was only partially supported by direct evidence presented at trial. In fact, the only direct evidence of advances to Country Maid are three cancelled checks payable to Country Maid on the joint account of William W. and Mrs. William W. Martin, and these checks total only $37,000. Bay State Exs. 37–39. However, there were Country Maid records tending to corroborate loans to it that totalled far more than $37,000.

19. The debtor does not possess completely detailed documentation directly reflecting loan repayments by Country Maid to debtor and his wife, or documentation reflecting precisely the current loan balance. However, the evidence shows that, in partial repayment of their joint advancements to Country Maid, the Martins received monthly repayments pre-bankruptcy ranging between $1,500 and $2,000. The debtor's personal records, which include cancelled checks from Country Maid to W.W. Martin and June Martin, identify repayments totaling $54,550. Bay State Exs. 42(1)–(4) and 43(1)–(8). Some of the Country Maid balance sheets, however, contradict the foregoing and reflect payments to the debtor sometimes exceeding $280,000 in a twelve-month period.[2] This contradiction

2. This Court previously observed:

Debtor asserts that the money that he and his wife received and continue to receive from

is clearly apparent in the 1987–88 fiscal year. Loans payable to shareholders went from $99,943 as of November 30, 1987, to negative $10,582 as of November 30, 1988. Bay State Exs. 18(a) and (b). However, cancelled checks from Country Maid to the Martins during this year only total $18,000, Bay State Exs. 43(1) and (5)–(8), and check stubs from that period only reveal loan payments totalling $21,000. Bay State Exs. 41(3)–(5), (7), (9)–(14), and (31). The debtor's October 1987 personal financial statement shows a balance due to William Martin, Sr. of $343,994. One month later, however, the debtor's financial statement, dated November 1987, shows a balance due to the debtor from Country Maid in the amount of $99,942. Without further explanation, the foregoing records shed little light and would tend to support the plaintiff's case.

20. However, the debtor's accountant prepared and presented at trial a detailed analysis of shareholder loans to debtor's corporations which made adjusting entries to explain fluctuations in the Country Maid balance sheets (the "Analysis"). See Debtor Ex. 13. Through his testimony and Analysis, the accountant explained that otherwise apparent discrepancies concerning the shareholder loans were accounted for through intercompany loans and cash payouts to Naples Italian Bakery, (another of debtor's entities) and his other explanations. For example, the balance of loans payable to shareholders in November, 1987 was adjusted by him from $99,943 to $168,332, and the balance of loans payable in November of 1988 was adjusted from negative $10,582 to positive $140,832. Debtor's Ex. 13. Both adjustments were made to account for intercompany loans to National

Country Maid is the repayment of advances they previously made to the corporation. Country Maid records this obligation to Debtor on its balance sheet as long term liability (Loan Payable–Shareholders). This account has varied in financial records of Country Maid as follows:

| Year–Ended | Loan Payable–Shareholders |
|---|---|
| 11/30/84 | ($83,467.00) |
| 11/30/85 | $384,623.00 |
| 11/30/86 | $100,000.00 |
| 11/30/87 | $99,943.00 |
| 11/30/88 | ($10,582.00) |

Flour. *Id.* Once these adjustments were made, the true balance of loans could be computed. The Analysis then reveals two more loan repayments to fully account for changes in Country Maid records between the two accounting periods. *Id.*

21. Martin's estate holds at least a 45% interest in issued stock of Country Maid.[3] This is potentially the most valuable asset of his estate. Plaintiff argues that the business lacks sufficient documentation to adequately reflect its financial condition. Since debtor is the corporate officer ultimately responsible for Country Maid records, plaintiff argues that his failure to maintain adequate corporate records effectively bars discharge under § 727(a)(3) because the corporate records should be adequate to document the value of his stock.

22. Joseph L. D'Amico was appointed by this court as Examiner to report on the personal and business financial affairs of the debtor. The Examiner's investigation included a review of all documents provided by the debtor, several interviews with the debtor and employees of the debtor's business interests, and several discussions with the debtor's accountant, Lawrence Goldstein.

23. Mr. D'Amico concluded that multiple deficiencies in the debtor's books and records prevented him at that time from adequately determining the financial affairs of the debtor's personal and business interests. Among the deficiencies, the Examiner noted that proper record keeping of the Country Maid business (such as the preservation for a safe period of time of daily cash register tapes) was not practiced; the corporate ledgers of Naples Bakery and Country Maid were commingled;

There was no evidence of loans by Debtor to Country Maid during 1989 or 1990....
*In re Martin,* 113 B.R. 949, 956 (Bankr.N.D.Ill. 1990). *See also,* Bay State Exs. 18(a)–(e).

3. Martin held a 60% majority interest in Country Maid Bakery. In June 1985, Martin transferred 15% of his Country Maid stock to his three children. The transfer is currently being challenged as a fraudulent conveyance. *Bay State Milling Company v. William Martin, Jr., et al.,* Adv.Pro. No. 91 A 00418.

shareholder transactions were not recorded; and basic cash accounting procedures to reflect daily sales voids and payouts were not in use. Additionally, the Examiner then found that no documentation existed from which he could determine the current status of the Martins' loans to Country Maid. Failure to maintain such records, the Examiner concluded in his report, prohibited the segregation of the personal and financial affairs of the debtor from that of Country Maid.

■ 24. Mr. Martin was the person ultimately responsible for business operations of Country Maid, and was therefore responsible for the state of its records. Such documentation referenced by the Examiner are ordinarily kept in businesses of this nature. Where the nature of a debtor's business operations indicates that others in like circumstances would ordinarily keep financial records, a debtor cannot justify his failure to maintain records merely by stating that he did not comprehend the need for them or that it was not his practice to keep business records. *In re Ridley*, 115 B.R. 731 (Neither lack of education nor lack of training in business management will generally be seen as justification for failure to keep adequate books and records, where such books and records would normally be kept as part of debtor's trade or business). Any attempt to justify failure to keep records must show that circumstances were in fact so unusual that ordinary record keeping was not required. *In re Morando*, 116 B.R. 14 (Bankr. D.Mass.1990). *See also In re Potter*, 88 B.R. 843 (the adequacy of books and records depends on the nature of the debtor's transactions and business interests).

25. In addition to deficiencies reported by the Examiner in record keeping at Country Maid, the debtor's records related to personal loans to Country Maid are confusing. Advances to Country Maid purportedly exceeding a quarter of a million dollars and repayments extending over five to ten years certainly warranted documentation. The debtor could have kept all canceled checks and records susceptible of easy review.

[10] 26. Bay State satisfied its burden of proof to show *prima facie* the inadequacy of records as to debtor's personal and business financial affairs. Consequently, the burden shifted to Martin to provide evidence that adequate information existed, *In re Goldstein*, 123 B.R. at 522. Debtor then became obliged at trial to prove that he maintained adequate written information or to justify his failure to maintain records because of unusual circumstances. *In re Morando*, 116 B.R. at 15–16 (Establishment of inadequate records shifts burden to debtor to justify absence of complete records).

■ 27. However, with aid of his accountant Mr. Goldstein, who testified persuasively (if somewhat belatedly in the context of the history of debtor's bankruptcy proceedings), Martin explained the fluctuations in Country Maid records as to his loans, and other matters. The accountant adequately explained and tied down the otherwise inexplicable fluctuations in Country Maid balance sheet entries from year to year. From the accountant's evidence, it is apparent that records were kept from which the amounts of loans and repayments thereto may be ascertained.

28. From that and other evidence (see, e.g., Finding No. 15), it is also apparent that sufficient Country Maid records were kept from which its cash flow and value as a going business could be calculated. Indeed, evidence did not establish that the bakery's cash flow records were inaccurate even though it was shown that better cash controls were warranted. Thus, the preponderance of evidence shows that Martin's records and those of Country Maid contained adequate information to trace his past financial transactions and ascertain his financial condition in bankruptcy, including the value of his stock in Country Maid.

*Count V*

29. Bankruptcy Trustees lack the time and resources to play detective and uncover all the assets and transactions of their debtors. *In re Dreyer*, 127 B.R. at 595; *In*

re Graham, 111 B.R. 801, 806 (Bankr. E.D.Ark.1990); In re Topping, 84 B.R. 840, 843 (Bankr.M.D.Fla.1988). Therefore, debtors in bankruptcy have an affirmative duty to surrender to the Trustee or Examiner all recorded information relating to property of estate, and are also obligated to cooperate by providing the Trustee or Examiner with all relevant documents and papers and fully answering the questions in the petition for relief and attached schedules. In re Dreyer, 127 B.R. at 595; In re Graham, 111 B.R. 801, 806 (Bankr. E.D.Ark.1990). Section 727(a)(4)(D) enforces this obligation by denying discharge to debtors who intentionally withhold records, books, documents, or other papers relating to their property or financial affairs. In re Ridley, 115 B.R. 731.

30. To establish grounds to bar discharge under § 727(a)(4)(D) for concealment of records from the Examiner or Trustee, plaintiff must show:

> the debtor knowingly and fraudulently, in or in connection with the case—withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs....

11 U.S.C. § 727(a)(4)(D). The requisite intent to act knowingly and fraudulently "may be established by circumstantial evidence, or by inference drawn from a course of conduct." In re Trinsey, 114 B.R. 86, 92 (Bankr.E.D.Pa.1990), quoting In re Hadley, 70 B.R. 51, 58 (Bankr.D.Kan.1987). See also In re Krich, 97 B.R. 919, 923 (Bankr.N.D.Ill.1988) ("the Court can infer from continuing concealment and nondisclosure the requisite fraudulent intent").

31. Plaintiff contends in Count V that Martin's discharge should be denied on grounds that he fraudulently concealed documentation from the Examiner and the Trustee. Throughout this case, Martin asserted that his financial records and accounts are adequate.

32. Upon motion by the Creditor's Committee and Bay State, this Court authorized the Examiner to investigate, inter alia, the books, records, and financial affairs of the debtor, of Country Maid, and of National Flour, and report to the Court and the parties in interest on matters including the following:

A. The amount of cash withdrawn from Country Maid Bakery, Inc. for the payment of expense of the debtor and his wife during the year 1988;

. . . .

C. The adequacy of the books and records of the debtor and of Country Maid Bakery and recommendations for improvements.

Order, entered March 14, 1990.

33. The Examiner's preliminary report contended that further investigation would not further benefit the creditors or the Court because the debtor's personal and business records were significantly deficient, thereby precluding accurate conclusions as to the debtor's past or present financial affairs. Based in part on the Examiner's conclusions and in part on debtor's failure to file a proper Disclosure Statement and viable Plan, this Court appointed a Chapter 11 Trustee.

34. Following his earlier investigation, the Examiner reported that he reviewed all existing documents and requested relevant documents not provided. Plaintiff asserts that, if Martin's assertion of adequate documentation of his financial affairs is true, then Martin knowingly and fraudulently withheld from the Examiner books, documents, records, and papers relating to his property or financial affairs.

35. Plaintiff's theory in Count V rests on a syllogism. It argues:

—That the Examiner found records to be inadequate;

—That, if the records are now found to be adequate, some were withheld, and discharge should be barred for that withholding.

However, the evidence at trial showed that, while Country Maid records were not susceptible of easy analysis and frustrated the Examiner's initial study, he did not conduct studies to determine factual accuracy of those records which are on their face suffi-

cient to enable all necessary calculations. The evidence at trial also demonstrated that material books or records were not actually withheld from the Examiner. Although the requested records were produced following need for prodding, they were materially produced eventually, not withheld.

36. Martin admits fault in his failure to list his interest in the loan receivable as an asset on his schedules. If he had not otherwise disclosed that loan, that would be enough to bar discharge pursuant to 11 U.S.C. § 727(a)(4)(A). *In re Krich*, 97 B.R. at 923–24 (denying discharge for failing to disclose an interest in accounts receivable due to debtor's company). However, as earlier noted, he did reveal existence of that loan asset within his Statement of Affairs.

### Count VI

37. A debtor "cannot abuse the bankruptcy process by obfuscating the true nature of his affairs, and then refusing to provide a credible explanation." *In re Johnson*, 98 B.R. 359, 366 (Bankr.N.D.Ill. 1988), quoting *In re Martin*, 698 F.2d 883, 888 (7th Cir.1983). Therefore, the discharge will be denied if "the debtor has failed to explain satisfactorily ... any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5). To obtain denial of Martin's discharge pursuant to this section, Plaintiff must prove that at one time Martin owned substantial and identifiable assets that are no longer available to debtor's creditors. *ITT Commercial Finance Corp. v. Walz*, 115 B.R. 353, 357 (Bankr.N.D.Fla.1990), citing *In re Sklarin*, 69 B.R. 949 (Bankr. S.D.Fla.1987). Once Plaintiff meets this initial burden, the debtor becomes obliged to give a satisfactory explanation for the loss. *In re Chalik*, 748 F.2d 616, 619 (11th Cir.1984). *See also In re Potter*, 88 B.R. at 849 ("Once the creditor has introduced *some* evidence of the disappearance of substantial assets, the burden shifts to the debtor to explain satisfactorily the losses of deficiencies.") (emphasis supplied). To be satisfactory, the explanation must demonstrate the debtor has exhibited good faith in conducting his affairs and explaining the loss of assets. *In re Chalik*, 748 F.2d at 619; *In re Burns*, 133 B.R. 181, 184 (Bankr.W.D.Pa.1991); *ITT Commercial Finance Corp.*, 115 B.R. at 357. The explanation need not be completely comprehensive, but "vague and indefinite explanations of losses that are based on estimates, uncorroborated by documentation are unsatisfactory." *In re Chalik*, 748 F.2d at 619; *Baum v. Earl Millikin, Inc.*, 359 F.2d 811, 814 (7th Cir.1966).

38. Courts have frequently denied discharge pursuant to § 727(a)(5) when a loss has not been satisfactorily explained. *See, e.g., In re Martin*, 698 F.2d 883 (7th Cir. 1983) (reversing a granting of discharge because the debtor did not adequately explain why he transferred $15,000 to his parents before filing his bankruptcy petition); *In re Johnson*, 98 B.R. 359 (Bankr. N.D.Ill.1988) (Debtor did not adequately account for significant change in financial condition from positive net worth of $200,-000 to negative net worth in excess of one million dollars three years later); and *In re White*, 63 B.R. 742 (N.D.Ill.1986) (no satisfactory explanation from the disappearance of $10,000 in cash).

39. Martin asserts in his bankruptcy proceeding that the estate is now without liquid assets. He also asserts, in defense of related Adversary No. 91 A 4180, that he was solvent and able to pay Bay State the amount indebted at the time of the transfer of stock to his children in June of 1985. Financial statements in both 1985 and 1987 apparently prepared by the debtor reflected a substantial net worth. The debtor is here accused of failure to explain satisfactorily any loss of assets or deficiency of assets to meet his liabilities.

40. The Court is not prepared to rule on Count VI on the present record because additional evidence will soon be taken in Adversary No. 91 A 4180, relating to the assets and liabilities of debtor at times critical to Count VI. All evidence pertaining to Count VI will be considered after that trial is concluded and the relevant evidence is complete.

## CONCLUSION

For reasons stated, by separate Order judgment is entered for Defendant on Counts I, II, IV, and V; and Count VI is consolidated for further trial with related Adversary case 91 A 4180. The judgments entered this date are not certified for appealability. If there is to be any appeal, it should follow completion of work by the parties and Court on all Counts hereof.