Joseph Dorocke and Marie Dorocke, Plaintiffs, Appellants, v. Harvey W. Farrington, Beatrice Farrington Kuhl, and Bertha Farrington Lyman, Not Individually or Personally, But as Heirs, Grantees and Personal Representatives of Harvey Farrington, Deceased, Defendants, Appellees.

Gen. No. 48,922.

First District, Second Division.

October 1, 1963.

Rehearing denied October 23, 1963.

Nat M. Kahn, of Chicago, for appellants.

Yowell, Long, MacDonald & Yowell, of Chicago (John J. Yowell, G. Kent Yowell and William R. Yowell, of counsel), for appellees.

MR. JUSTICE BRYANT delivered the opinion of the court:

This is an appeal from a decree of the Superior Court of Cook County dated May 16, 1962, approving a report and supplemental report of a Master, denying plaintiffs' motion for leave to file a separate count in quantum meruit, and dismissing the complaint for want of equity. There are three questions before this court: (1) whether the Chancellor erred in finding that the plaintiffs had not proved an express oral contract; (2) whether the Chancellor erred in refusing to allow plaintiffs to file an alternative count in quantum meruit; (3) whether the Chancellor was empowered to impress a lien on the equitable interest of the original defendant, Dr. Farrington, in real estate occupied as his home which was held in a naked title trust.

The plaintiffs, Joseph M. Dorocke and his wife, Marie, and child lived in the home of Dr. Harvey

Farrington from May 25, 1951 to June 10, 1956. Marie Dorocke had been a patient of Dr. Farrington and their families had been friends for years. The Dorockes moved in with Dr. Farrington, who had recently become a widower, so that Marie would have closer care from Dr. Farrington and so the doctor would have some company. Dr. Farrington was about 80 at this time. The Dorockes were not related to Dr. Farrington nor were they engaged as servants.

The Dorockes alleged that in consideration for their services the doctor agreed to sell them his home at a price not to exceed two-thirds of its fair market value. During the years various witnesses heard mention of conversations concerning the purchase of the home, but no actual offers were testified to. The Dorockes contended that the doctor continued to maintain that the home was worth a good deal more than they believed and that this excused them from tendering a definite offer. Beyond this the Dorockes alleged a supplemental agreement whereby the doctor would make a further reduction in the purchase price of one-fourth of total money outlays for groceries and general upkeep of the house made by the Dorockes.

Some time in 1955 Dr. Farrington began a systematic reduction of his estate. He placed title of the real estate occupied as his home in the hands of his attorney as trustee of a naked title trust with instructions to convey to his children upon his death. He also stripped himself of about $30,000 cash assets through gifts to his children. When he died on June 9, 1957, his estate consisted of less than $500.

The Dorockes brought this action before the death of Dr. Farrington asking the entry of a money decree in favor of the plaintiffs against the defendant, Dr. Farrington, and asking that a lien for this sum be imposed against the Glenview property. Their theory basically was that Dr. Farrington had breached an

express oral contract and that the deed to his attorney either was impressed with a trust in favor of purchase by the plaintiffs or in the alternative the deed was voidable because made for the purpose of fraudulently defeating creditors. After the death of Dr. Farrington his children were substituted as defendants as heirs and representatives of their deceased father.

■ We agree that the Chancellor made a correct determination that an express oral contract for the sale of the real estate to the Dorockes by Dr. Farrington at a reduced price was not proven by the plaintiffs. The witnesses produced by the plaintiffs tended to show no more than that the possibility of selling the home to the Dorockes was talked about and that Dr. Farrington was indebted to Marie Dorocke for the "fine" care which he had received at her hands.

■ ■ Plaintiffs secondly contend that the Chancellor erroneously denied them the right to file an alternative count in quantum meruit. If there was a meeting of the minds on the terms of an oral contract plaintiffs could recover under that contract and could not supersede the contract by relying on a quantum meruit theory. (Walker v. Brown, 28 Ill 378; Goodman v. Motor Products Corp., 22 Ill App2d 378, 161 NE2d 31; Borrowdale v. Sugarman, 347 Ill App 390, 107 NE2d 45.) If the terms of the oral contract were not proven the plaintiffs have a right to proceed on the theory of quantum meruit. (People's Cas. Claim Adjustment Co. v. Darrow, 172 Ill 62, 64, 49 NE 1005; Moreen v. Estate of Carlson, 365 Ill 482, 493, 6 NE2d 871.)

The Master found that the terms of an oral contract and the complete performance thereunder had not been proven in the clear, definite and unequivocal manner required by law.

■ Some agreement undoubtedly did exist as the plaintiffs had lived with Dr. Farrington for five years.

However, the Master was not even able to ascertain the limits of the original arrangement between the parties. These findings do not preclude the filing of an alternative count in quantum meruit. In such a situation the plaintiffs should be allowed to establish the value of their services, if any, above the rent free occupancy and other benefits of living with the doctor.

We can see no reason why plaintiffs' motions to proceed in the alternative should be denied. Section 46(3) of the Civil Practice Act states: "A pleading may be amended at any time, before or after judgment, to conform the pleadings to the proofs, upon terms as to costs and continuance that may be just." (Ill Rev Stats 1961, c 110, § 46(3).)

The plaintiffs had sought to amend their complaint on April 1, 1959, on May 25, 1960, and on February 16, 1961. The defendants had at all times throughout their answers to plaintiffs' motions to file a separate count in quantum meruit and during the taking of testimony before the Master maintained that they have always been before the court in a representative capacity and that to allow an alternative count against them would necessitate an action against them personally and individually. The judges who ruled upon the motions based their decisions denying or postponing the motion upon the added delay in requiring personal service and new pleadings which would have been caused at that time. Indeed one Chancellor stated:

> "No, I am denying you leave to file, at this time, the amended complaint or this alternative complaint so there is no hearing on it. It is not res judicata. It is open for full and complete litigation when and if you ever complete the present proceedings before the master."

We find that in the exercise of a reasonable discretion the Chancellor should have allowed plaintiffs to file their alternative count in quantum meruit.

■ In addition, the plaintiffs suggest that since this court has the power to amend the pleadings to conform to the proof, we should herein render a judgment for the plaintiffs in quantum meruit for the sums which were reasonably shown in the presentation of evidence below. We think that the defendants should have an opportunity to present their evidence on this issue. For this reason further hearings should be held to determine the value of services, if any, above the benefits derived by plaintiffs and their son from living in the Farrington home and the value of professional services rendered, if any, by Dr. Farrington to Mrs. Dorocke.

Plaintiffs also say that since Dr. Farrington conveyed the realty to his attorney as trustee in 1955, the conveyance was a fraud upon creditors. The plaintiffs show that judgments by confession had been obtained in 1937 against Dr. Farrington. Plaintiffs further contend that a fraud upon one creditor is a fraud upon all creditors. In the alternative they contend that at the time of the conveyance of the realty to the trustee they were creditors themselves, having performed uncompensated services.

It is undisputed that there is a renewed judgment dating from 1937 which in 1955 could have been perfected against the property of Dr. Farrington.

> "A contingent liability is protected against fraudulent and voluntary conveyances as fully as a claim certain and absolute; and whoever has a claim or demand arising out of a pre-existing contract, although it may be contingent, is a creditor whose rights are affected by such conveyances and can avoid them when the contingency happens upon which the claim depends." (Sallaske v.

400

Fletcher, 73 Wash 593; 24 Am Jur, Fraudulent Conveyances, § 137, p 280, n 1.)

"It is not necessary that the transferrer's intention to defraud shall have been directed against any particular person. . . . If a conveyance is made with a view to the transferrer's becoming subsequently indebted, there is no doubt that subsequent creditors may attack the transaction; and the necessary intent to defraud such creditors may be inferred from the circumstances." (24 Am Jur, Fraudulent Conveyances, § 143, p 284.)

See also 37 CJS Fraudulent Conveyances, § 113, p 952; 20 ILP Fraudulent Conveyances, § 182, p 182.

■ The heart of an attempt to set aside a conveyance on the basis of fraud is proof of actual fraud.

"The issue as to whether or not a conveyance was executed by the transferrer with the intention of defrauding subsequent creditors is to be determined with a view to the circumstances which attended the transaction . . . . The fact that there were pre-existing debts is always important in determining the issue as to the existence of fraudulent intent." (24 Am Jur, Fraudulent Conveyances, § 144, p 286.)

■ Here it is undisputed that there is a prior outstanding debt and the 1937 judgment. The Dorockes have a claim for services and cash outlays above the value of the rent and other benefits which they received, if any. It is undisputed that the doctor systematically reduced his estate. Since he knew of these possible claims against him, and continued to reduce his estate to the detriment of his creditors, we feel that the conveyance was fraudulent.

■ The last point remaining to be considered is whether the lower court has the power to settle the question of the fraudulent conveyance and bring the

real estate into the proceeding below for the purpose of ordering a sale if necessary. We think that it does. Section 44(1) of the Civil Practice Act provides:

> "Subject to rules any plaintiff or plaintiffs may join any causes of action, whether legal or equitable or both, against any defendant or defendants; . . . . In particular, a plaintiff may join a cause of action for money damages and a cause of action to set aside a conveyance fraudulent as to him, without first having obtained a judgment establishing the cause of action for money damages." (Ill Rev Stats 1961, c 110, § 44(1).)

In Young v. Wilkinson, 18 Ill2d 428, 164 NE2d 39, the court tested the application of section 44(1) in a case where a creditor's bill was maintained in conjunction with a count for specific performance. The court stated at page 431:

> "From the foregoing it seems perfectly clear, as plaintiffs contend, that it was the deliberate intention of the legislature to permit the joinder of two separate and distinct causes of action in the complaint as was done here, . . . ."

For these reasons the decree is reversed and the cause is remanded with directions to allow plaintiffs to file their alternative count in quantum meruit, permit defendants to plead thereto, permit the parties to present evidence on the issues joined and for further proceedings according to the views expressed.

Decree reversed and cause remanded with directions.

BURKE, PJ and FRIEND, J, concur.