**In re William MARTIN, Sr., Debtor.**

**BAY STATE MILLING COMPANY, a Minnesota corporation, Plaintiff,**

**v.**

**William MARTIN, Sr., Defendant.**

**BAY STATE MILLING COMPANY, a Minnesota corporation, for the use and benefit of the estate of William Martin, Sr., Plaintiff,**

**v.**

**William Martin Jr., Diana June Franchi, and Betty Lou Doty, Defendants.**

Bankruptcy No. 89 B 9796.
Adv. Nos. 90 A 1003, 91 A 418.

United States Bankruptcy Court,
N.D. Illinois, E.D.

Sept. 24, 1992.

---

934

Bernard M. Kaplan, Ruben Kaplan & Rosen, Skokie, Ill., for William Martin Sr., William Martin Jr., Diana June Franchi, and Betty Lou Doty.

Karen Moore, Office of the U.S. Trustee, Chicago, Ill.

Paul M. Bauch, David Cleary, Bell Boyd & Lloyd, Chicago, Ill., for Bay State Milling Co.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER, Bankruptcy Judge.

This matter comes before the Court on the consolidated trial of two Adversary complaints filed by plaintiff Bay State Milling Company ("Bay State"). In Adversary Complaint No. 90 A 1003, Bay State seeks to bar discharge of debtor William Martin, Sr. ("Martin") under 11 U.S.C. § 727, based on a series of alleged concealments of assets (Counts I, II, and V), failure to maintain adequate records (Count IV), and failure to adequately explain a diminution of his assets prior to bankruptcy (Count VI). By judgment order entered May 18, 1992, the Court entered judgment in favor of debtor on Counts I, II, IV, and V, and deferred judgment on Count VI following additional relevant evidence to be heard in the trial on Adversary Case No. 91 A 418. *Bay State Milling Co. v. Martin,* 141 B.R. 986 (Bankr.N.D.Ill.1992). Count III was dismissed by order of Court on November 25, 1991.

In Adversary Complaint No. 91 A 418, Bay State seeks to set aside gift transfers of 15% of the outstanding shares of common stock in Country Maid Bakery, Inc. ("Country Maid") from debtor to his children, defendants William Martin, Jr., Diana June Franchi, and Betty Lou Doty, as fraudulent conveyances under 11 U.S.C. § 544(b) and Illinois fraudulent conveyance law.

A consolidated trial on both Adversary No. 91 A 418 and Count VI of Adversary No. 90 A 1003 was held before the Court on August 17, 19, 20, 21, 24, 26 and 27, 1992. Having considered the evidence, arguments of counsel, and all submissions in the record, the Court now makes and enters the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. Country Maid is an Illinois corporation in the business of producing and selling baked goods both at the wholesale and retail level through its stores in Arlington Heights, Buffalo Grove, Glenview, Highland Park, Northbrook, and Northfield (all northern suburbs of Chicago). It also operates a restaurant in Northbrook known as "Country Maid Cafe-ette".

2. In 1972 or 1973, debtor and his wife June Martin purchased Country Maid. From that time until June 1, 1985, debtor held 60% of the outstanding shares in this corporation and his wife held the remaining 40%.

3. National Flour Company ("National Flour") was formed in 1963. It is an Illinois corporation in the business of wholesale flour distribution. Until January 1983, National Flour had two divisions—one in Wilmette, Illinois and the other in Milwaukee, Wisconsin. Martin owned 100% of the outstanding shares of National Flour.

4. In 1980, Mr. Philip Sylvester was hired as a salesman for National Flour's Milwaukee division. In 1982, he began to negotiate with Martin to acquire an ownership interest in National Flour. As a result of these negotiations, a new corporation known as National Flour of Wisconsin ("Wisconsin") was formed in January 1983. Wisconsin acquired the assets and assumed the liabilities of National Flour's Milwaukee division, while National Flour continued to own and operate the Wilmette division. Sylvester and Martin each owned 50% of the outstanding shares of Wisconsin. Sylvester contributed $60,000 as consideration for his shares.

5. The parties dispute who controlled the operations of Wisconsin after its formation, but this point is not relevant in this case. Both parties were officers of the company, and as such they both incurred liability for unpaid withholding taxes as "responsible persons" under 26 U.S.C. § 6672(a).

6. Bay State is a flour miller and a wholesale distributor of flour and milled grain products. Bay State sold flour and milled grain products to both National Flour and Wisconsin. These products were generally delivered on credit, and, in 1967, Martin executed a guarantee that made him personally liable for National Flour's debt to Bay State. Bay State Ex. 1.

7. In 1983, a similar guarantee was executed by Martin making him personally liable for Wisconsin's debt to Bay State. This guarantee contained the same language, but it also had a clause that stated, "The day either partner/owner is no longer financially involved with [Wisconsin], and with due notice to [Bay State], said party is no longer a guarantor." Bay State Ex. 2.

8. North Dakota Mill and Elevator Association ("North Dakota") also supplied flour to National Flour and Wisconsin on credit. In 1979, Martin executed a guarantee of National Flour's obligations to North Dakota. No similar guarantee was executed for any liability of Wisconsin to North Dakota.

9. In February 1985, Martin sold his 50% stock interest in Wisconsin to Sylvester in return for $40,000 and a promise to pay $60,000 at a later date. At the time of the sale, Wisconsin owed several hundreds of thousands of dollars to Bay State.

10. Within a few months after the sale of shares in February of 1985, Wisconsin defaulted on its obligations to Bay State. When Wisconsin defaulted, Bay State called upon Martin to honor his personal guarantee and pay what Wisconsin owed it.

11. The foregoing events gave rise to litigation between Martin, Sylvester, Wisconsin, and Bay State. After the stock sale, Bay State's demands to be paid resulted in a suit being filed by it against Martin, Sylvester, and Wisconsin in the U.S. District Court for the Eastern District of Wis-

consin. Also, following the stock sale, Sylvester claimed to have been defrauded by Martin because of misrepresentations made about the financial condition of Wisconsin. Wisconsin also made a claim against Martin for conversion of certain assets to Martin's personal use. These claims resulted in cross-claims being filed against Martin in the district court case.

12. The claims against Martin were litigated before a jury. In 1988, judgment was entered against Martin in the amounts of $447,528.36 on the complaint of Bay State for flour sales guaranteed by Martin; $50,000 in compensatory damages on the cross-claim of Sylvester for fraud; and $25,998.28 on the cross-claim of Wisconsin for conversion. *See Bay State Milling Co. v. National Flour Co. of Wisconsin, et al.,* Judgment Order, 85 C 1242 (E.D.Wisc. Aug. 17, 1988), Bay State Ex. 8. The jury also awarded Sylvester $70,025.79 in punitive damages based on the fraud claim. This judgment was affirmed on appeal to the Seventh Circuit Court of Appeals.[1]

13. There is some controversy as to whether Martin concealed his sale of Wisconsin shares from Bay State. The existence of concealment is relevant to the fraud-in-fact charge here because it sheds light on Martin's state of mind at the time of the alleged fraudulent conveyance. Martin testified that he would not have concealed the stock sale because he believed that notice to Bay State of the stock sale would relieve him of liability under the terms of the personal guarantee. (*See* Finding No. 7). However, this issue does not need to be decided here because the jury in the district court case determined that Martin did intend to conceal the stock sale.

14. The evidence in this case warrants that finding. A likely and plausible reason for Martin's act of concealment appears when one looks at his guarantee of Wisconsin's debts. The guarantee is read to mean that, if either of the guarantors were to sell his interest in Wisconsin, then he would be relieved only of liability for future flour purchases. There is no reason to believe from the language quoted above (Finding No. 7) that the parties intended the selling guarantor be relieved of liability for prior extensions of credit. That is how the District Court jury and the Seventh Circuit opinion interpreted the guarantee, *see Bay State,* 916 F.2d at 1226, and that is how this Court interprets it.

15. Thus, as Martin sold his stock, he remained liable for Wisconsin's prior debt. At the same time, without his continuing guarantee, Wisconsin was no longer as credit-worthy as before. Therefore, he knew that, if the stock sale were revealed, Bay State would likely stop supplying flour to Wisconsin and collect the debt still owing. To collect that Wisconsin debt, it could enforce the guarantee. This means that he knew Bay State would likely move to enforce Martin's guarantee soon after it discovered Martin's sale of his stock in Wisconsin. Therefore, Martin had a motive to conceal the sale of share in order to avoid Bay State's enforcement of the guarantee.

16. Martin knew that the stock sale placed Sylvester and Wisconsin in economic jeopardy, and he attempted to conceal his sale of Wisconsin stock from Bay State to defer his guarantee of debt to Bay State. The potential claims of Bay State, Sylvester, and Wisconsin against him were all known by Martin prior to June 1, 1985. Although the district court lawsuit was not filed until the fall of 1985, the existence and size of these prospective claims were abundantly clear to Martin as of June 1, 1985.

17. During the Christmas season of 1984, Martin discussed transferring some of his shares in Country Maid to his three children, William Martin, Jr., Diana June Franchi, and Betty Lou Doty. The children testified that Martin had been telling them for several years preceding that time that he would give them such shares, but they felt that their father's promises ripened from an idea to reality during Christmas 1984.

---

1. For more information on the substantive claims of Bay State, Sylvester, and Wisconsin, *see Bay State Milling Co. v. Martin,* 916 F.2d 1221 (7th Cir.1990).

18. Martin had two legitimate purposes in transferring shares to his children. Each of these children worked at the restaurant and store in Northbrook, and he wished to reward them for their service to his company. Also, Martin was in his mid-sixties in 1985, and he wished to pass shares of Country Maid stock on to his family in the event of his death or retirement.

19. However, while Martin had legitimate purposes for giving the shares to his children, the circumstances surrounding the stock gifts clearly demonstrate they were given to hinder and avoid Martin's creditors. First, the transfer of Country Maid shares did not occur at or around Christmas of 1984 or earlier when he first mentioned the possibility. Instead, on June 1, 1985, Martin approached his three children while they were working and handed each of them certificates representing 250 shares of his common stock in Country Maid (5% of the outstanding shares to each child). The three stock transfers were all made in one day, and all the paperwork surrounding these transfers was prepared by his accountant and also executed on that same day. In fact, the certificates were not even signed by Mr. Martin before they were given to the children (nor were they signed even by time of trial). It is highly suspect that a Christmas gift would be given in such a hurry the following June. Moreover, the children immediately gave the unsigned certificates back to their father "to hold", and they never kept those certificates.

20. Following the stock transfer, Mrs. Martin and the children held a controlling stock interest in Country Maid. However, as was clear from the evidence, they continued to look at Martin as the President and real boss of Country Maid. By transfer-

ring a controlling share of Country Maid stock to his family, Martin could maintain *de facto* control of the company even were he to lose his remaining shares to satisfy creditors. Thus, Martin made a seemingly innocuous gift to his children that effectively gutted the value of what was his largest personal asset in order to prevent Country Maid from falling under control of hostile creditors whose claims loomed ominously. The clear and convincing evidence shows that Martin timed the transfer of his shares in Country Maid with intent to hinder and delay his creditors, and the effect of that transfer was in fact to hinder and delay his creditors.

21. There is no question that the Country Maid shares were transferred without consideration. The defendants all conceded that the shares were given as a gift. The only factual dispute relevant to the constructive fraud count was whether Martin was insolvent on June 1, 1985 when the transfers occurred.

22. Both parties presented evidence of Martin's financial status. The starting point of analysis for both parties was the balance sheet prepared by Martin's accountant, Lawrence Goldstein that lists Martin's assets and liabilities. Martin Ex. 26. This statement showed Martin to have assets exceeding his liabilities by $1,044,596. Bay State submitted evidence which used Mr. Goldstein's balance sheet as a starting point, and then made certain adjustments to show that Martin's liabilities exceeded his assets by an amount between $546,266 and $1,085,952. Bay State Ex. 105A.

23. The following balance sheet summarizes the Court's findings as to the state of Martin's assets at the time of his transfers of Country Maid stock to his three children:

ASSETS
Current:

| | |
|---|---|
| Cash—Northbrook Bank checking | $17,372 |
| Cash—Northbrook Bank saving | 5,912 |
| Cash—Northbrook Bank basil | 8,420 |
| Cash—Northbrook Bank Trust CD | 2,718 |
| Cash—Northbrook Bank Trust CD | 5,000 |
| Cash—Northbrook Bank Trust CD | 5,000 |
| Cash—Citizen's Bank checking | 4,000 |

| | |
|---|---:|
| Cash—Pathway Savings | 1,500 |
| Cash—Pathway Savings | 1,500 |
| Cash—Crawford S & L | 4,931 |
| U.S. Government E Bonds | 2,500 |
| Commonwealth Edison Stock | 6,938 |
| GD Searle Stock | 24,000 |
| Total Current Assets: | $89,791 |

Non-current:

| | |
|---|---:|
| ⅓ interest in Addison, IL 12–flat | $93,000 |
| Residence—1240 Techny Rd., Northbrook | 82,500 |
| Rental Prop.–6160 N. 60th St., Milwaukee | 77,500 |
| Rental Prop.–12102 Tomahawk, Milwaukee | 87,570 |
| Installment Note—sale of Lake Bluff Prop. | 307,310 |
| Loan Receivable–Country Maid | 106,480 |
| Cash Surrender Value–Life Insurance Policy | 20,000 |
| Equity Interest–Country Maid | 82,520 |
| Equity Interest–National Flour | 25,000 |
| Total Non-current Assets: | $881,880 |
| Total Assets | $971,671 |

LIABILITIES

Current:

| | |
|---|---:|
| Note Payable–Northbrook Bank | $15,000 |
| Note Payable–Northbrook Bank | 30,000 |
| Life Insurance Loan | 20,000 |
| Due to National Flour | 233,526 |
| Due to Bay State Milling | 398,597 |
| Due to Phil Sylvester | 50,000 |
| Due to the IRS | 17,000 |
| Due to National Flour of Wisconsin | 26,000 |
| Total Current Liabilities: | $790,123 |

Non-current:

| | |
|---|---:|
| Mortgage Payable–First Federal Wilmette (mortgage on residence) | $48,500 |
| Mortgage Payable–Brown Deer Bank (mortgage on 60th St. prop.) | 32,621 |
| Mortgage Payable–First Wisconsin Bank (mortgage on Tomahawk prop.) | 67,000 |
| Mortgage Payable–First Federal Wilmette (mortgage on Lake Bluff note) | 257,000 |
| Mortgage Payable–NBK Bank (mortgage on Addison prop.) | 53,333 |
| Total Non–Current Liabilities: | $458,454 |
| Total Liabilities: | $1,248,577 |

---

Martin was thus insolvent at the time of the stock transfer because his liabilities exceeded his assets by $276,906.

24. The asset figures in the above Finding were computed with Mr. Goldstein's balance sheet as a starting point. Then the following adjustments were made to the valuation of Martin's assets:

A. Although several of the cash accounts were jointly held by Martin and his wife, the full amounts of those accounts were counted as assets available to Martin's creditors.

B. The Certificates of Deposit held at Northbrook Trust & Savings Bank ("Northbrook Bank") were jointly held by Martin and his father, but his father died prior to June 1, 1985. Thus, the full value of those accounts were counted as assets available to Martin's creditors.

C. A passbook savings account at Crawford Savings & Loan Association was omitted from Martin's and Bay State's summaries, but this account was added because its existence and balance were proved in Martin Ex. 26.

D. The value of each of the real properties was reduced by 10% to reflect the brokerage commissions and other costs to be incurred in the sale of these properties. The value of Martin's residence at 124 Techny Road was lowered by an additional $7,500 on top of the 10% discount to account for Martin's homestead exemption under Ill.Rev.Stat. ch. 110, ¶ 12–901.

E. While one checking account was located in Georgia and two parcels of land were located in Wisconsin, the Court has not reduced the value of these assets merely because they are not located in Illinois, as urged by plaintiff.

F. The real property located at 2152 Techny Road in Northbrook and its accompanying liability, a note payable to Northbrook Bank in the amount of $55,-000, were not counted in the Court's Findings because the property was sold and the note paid off in April of 1985.

G. The asset listed as "Installment Note—sale of Lake Bluff Prop." represents a note received by Martin and his wife as consideration for the sale of real property in Lake Bluff, Illinois that was jointly owned by them. First Federal Bank of Wilmette held a mortgage on the Lake Bluff property at the time of the sale. Consequently, that bank had a security interest in the installment note. This liability is listed in Finding No. 22 as "Mortgage Payable, First Federal, Wilmette". The note was jointly held by Martin and his wife.

H. Martin listed the value of the note for the Lake Bluff property at $417,097. However, two adjustments were made to this figure which caused the Court to value the note at $307,310 in Finding No. 22. First, Martin claimed that the net proceeds left after paying off the mortgage was $160,097. However, the actual net proceeds amounted to only $101,160. Thus, the value of the note was reduced by $58,937 to reflect the actual value of the net proceeds. Then, the value of the note was reduced by $50,850 to eliminate Mrs. Martin's 50% interest in the note.

I. The value of the loan receivable from Country Maid was reduced by half to eliminate Mrs. Martin's 50% interest in the loan.

J. "Equity interest—Country Maid" represents the value of Martin's 45% share of Country Maid stock. Martin valued his 60% share of Country Maid at $330,000, but that figure must be reduced to take into account several factors. First, the value of his shares must be reduced by one-quarter to reflect the transfer of one-quarter of his holdings to his children.

K. Then, the remaining 45% of shares must be discounted to reflect the risks involved in buying a minority interest in a closely-held family business. Martin argued that a minority discount should not be applied because he has a closely-knit family that follows his directions concerning the business. However, this only supported the need to apply a discount. If the buyer of his 45% share ever antagonized Martin or any member of his family, that buyer could be effectively shut out of the business. Therefore, a minority discount equal to 30% of the value of Martin's 45% share is appropriate to reflect the risk to a potential buyer of facing a family united against that buyer.

L. Finally, the value of Martin's stock must be reduced to reflect the value of the loan receivable owed by Country Maid to the Martins. If a creditor were to take possession of both the loan receivable and the shares of stock, that creditor could not realize the full value of both assets. If one attempted to pay off the loan with assets of Country Maid, the

company would be rendered insolvent. On the other hand, if Country Maid's assets were preserved to keep the company afloat, then the loan could not be collected. Therefore, the value of Country Maid's share's must be reduced to eliminate what is in effect a double-counting of assets.

M. The value of Martin's equity interest in National Flour was reduced by $75,000 to account for three facts. First, National Flour reported a loss in 1985 and only a small profit in 1984. Bay State Ex. 105A. Second, National Flour's financial health in 1984 was artificially buoyed by the use of Wisconsin's assets to pay National Flour's debts. *See Bay State*, 916 F.2d at 1224, and the testimony of Philip Sylvester. Therefore, National Flour's financial status in 1984 was artificially improved. Finally, Martin owed National Flour $233,526. This loan was an asset on National Flour's balance sheet, Bay State Ex. 105A, but Martin could not entirely pay this loan because he was insolvent.

25. In arriving at the Court's Findings, the following adjustments were made to Martin's evidence as to his liabilities:

A. A loan payable by Martin and due to National Flour was listed on National Flour's balance sheet dated April 30, 1985. Bay State Ex. 76. Martin attempted to explain away this loan by having his accountant make a series of adjustments to loans due from shareholders. These adjustments are based on Mr. Goldstein's reconceptualization of certain intercompany debts, but this explanation is not credible.

B. In 1984 (when the balance sheet was actually created), Mr. Goldstein, as the company's accountant, recorded a loan due to National Flour. Mr. Goldstein was then called upon to make a readjustment in 1991 in response to this litigation. So, seven years later, he has decided that the transaction was either an intercompany loan or something else. Mr. Goldstein testified that he is not confident that these adjustments are accu-

rate. Therefore, the evidence weighs in favor of finding that the way Mr. Goldstein recorded the matter in 1984 was accurate. Accordingly, a loan payable by Martin to National Flour existed on June 1, 1985.

C. The amount due to Bay State represents the amount owed by Wisconsin as of June 1, 1985. Martin was liable for this amount due to his guarantee.

D. Only the amount due to Philip Sylvester for compensatory damages was counted as a liability as of June 1, 1985 because these damages were incurred by Martin as a result of his fraud (as found by the District Court jury) in his sale of Wisconsin stock to Sylvester. However, the punitive damages found due to Sylvester did not arise until the jury awarded them in 1988.

E. In 1985, Wisconsin incurred $27,000 in liability for unpaid withholding taxes. As an officer of Wisconsin, Martin was liable for a portion of these taxes. Bay State contends that he was liable for all of these taxes; however, he was only an officer of the company through February. Therefore, Martin was not liable for $10,000 in tax liability incurred after he left the company.

F. The jury damages awarded on Wisconsin's claim against Martin arose out of his acts of property conversion committed prior to February of 1985. Thus, he was liable for these damages as of June 1, 1985.

G. Martin guaranteed National Flour's debt to North Dakota and Country Maid's debt to Northbrook Bank. However, these creditors had not called on Martin to honor his guarantees as of June 1, 1985, and neither of these creditors moved to enforce these guarantees during the four years after that date. Also, Country Maid and National Flour were paying their debts to Northbrook Bank and North Dakota in 1985. Therefore, since the creditors were unlikely to call on their guarantees in 1985, these contingent debts are conservatively valued at zero for purposes of this analysis, and are consequently not listed on the Court's Finding of liabilities.

26. In February of 1984, June Martin signed a "Power of Attorney" form that gave her husband broad powers to "act in, manage and conduct all my estate and person and all my affairs, and for that purpose for me and in my name, place and stead, and for my use and benefit ..." Martin Ex. 27. Martin contends that assets held by his wife must be included in the solvency analysis because of his power of attorney over his wife's assets. However, the document signed by Mrs. Martin was only given to her husband to use her assets for her benefit. Payment of his debts with her assets is not in her benefit. Mrs. Martin corroborated this reading of the document when she testified that it did not give Mr. Martin the right to use her assets to pay his debts. Indeed, that power of attorney could not have been used by Martin's creditors to seize her assets. Therefore, the assets of Mr. and Mrs. Martin were not added together by the Court to determine the solvency of Mr. Martin.

27. While Martin was insolvent in June of 1985, he did have assets worth about $971,000. However, when he filed his bankruptcy petition in June of 1989, he listed assets worth only $201,250. *See* Schedules B–1 and B–2 of Martin's Bankruptcy Petition, Bay State Ex. 6. Also, while Martin valued his net worth at $1,044,596 on May 31, 1985, Martin Ex. 26, in his Balance Sheet dated May 31, 1987, Martin's net worth was listed at only $181,-500. Bay State Ex. 27. Therefore, Martin has to account for this significant diminution of assets.

28. Bay State specifically seeks to bar Martin's discharge because of his asserted failure to explain what happened to the proceeds from the sales of his stock in Commonwealth Edison and G.D. Searle, the Addison property, and the Tomahawk property. Bay State also seeks an explanation for what happened to the $101,160 in proceeds from the payment of the installment note, and an explanation for what happened to a $20,000 check that Martin cashed.

29. Martin sold his 400 shares of common stock in G.D. Searle Corp. in August of 1985 for $26,000. Martin Ex. 23d. Martin sold his 200 shares of common stock in Commonwealth Edison in July of 1988 and received $5,683. Martin Ex. 23a. Martin testified that the proceeds from these sales probably went to pay for living expenses.

30. The property in Addison was sold between June 1, 1985 and the end of·1986. This sale is evidenced by the omission of this asset from Martin's personal Balance Sheet dated May 31, 1987. Bay State. Ex. 27. Martin testified that he received a $30,000 check as his share of the net proceeds from this sale.

31. The property on 12102 Tomahawk Street was a house owned by Martin and occupied by Mr. Sylvester. Martin testified that he purchased the house because Sylvester could not personally obtain a mortgage. The arrangement was that Sylvester paid Martin rent equal to the mortgage and tax payments. In 1986 or 1987, after the disputes arose between these two, Martin evicted Sylvester and sold the house. The net proceeds from the sale of the Tomahawk property were $30,000. Martin claims that these funds were used to pay legal fees arising out of litigation concerning Sylvester's eviction. However, no lawyer's bills or checks to lawyers were produced, and no legal expenses were shown on Martin's 1987 income tax return. Bay State Ex. 29b.

32. In October of 1985, Martin and his wife received a check for $101,160 as payment for the installment note from the sale of property in Lake Bluff. Martin originally testified that the money probably went to pay off National Flour's indebtedness to Bay State. Martin later added to this explanation, stating that funds may have been used to furnish a house in Florida.[2]

33. On November 25, 1988, Martin wrote a check to himself for $20,000 out of his checking account at Northbrook Bank. Bay State Ex. 36. This check was subsequently cashed by him that same day. *Id.* Martin had no explanation for what happened to the cash. He testified that he

2. Country Maid had previously purchased a house in Florida for use of Martin and his wife.

was not in the habit of cashing $20,000 checks.

34. The net proceeds received by Martin from the disposition of the foregoing assets totalled approximately $210,000. However, he only has a satisfactory explanation for what happened to $118,630 of this money: He spent $45,000 to pay off two notes payable due to Northbrook Bank (Notes 10840 and 82728) by May 31, 1987. *See* Bay State Ex. 27 (balance sheet of Martin no longer listing the notes). He spent $12,000 to buy a 25% interest in a horse farm and two horses. He bought gold and silver coins for $15,230 in December 1985. Martin Ex. 32. He also bought a truck in December 1985 for $29,400. Martin Ex. 23a. He loaned $17,000 to Country Maid. *See* Bay ·State Ex. 38 ($17,000 check in October, 1985). In round numbers, Mr. Martin accounted for $120,000 out of $210,000 received.

35. That left $90,000 to account for here. Martin contends that he used some of this money for living expenses. To say that one spent $90,000 over four years (1985 to 1989) on living expenses could, in other circumstances, be a reasonable explanation for what happened to the money. However, in the context of evidence taken here, it is not.

36. First, Martin had several sources of income besides these assets. He received checks of $1,500 or $2,000 each month from Country Maid as payment for his loan receivable. He also received Social Security payments of about $200 each month. Moreover, the report of the examiner Joseph D'Amico on Martin's finances reveals that a portion of his living expenses were paid by Country Maid. Bay State Ex. 33. Bay State contends that Country Maid paid between $4,000 and $5,000 a month in personal expenses. How it derived this range of numbers is unclear, but it is certainly clear that at least a substantial amount of Martin's personal expenses for food were paid by Country Maid each month.

37. Second, Martin has produced no bank statements or credit card bills which would indicate how the funds were spent. While one should not expect an accounting for every dime spent by Martin, proof of some pattern of cashed checks or withdrawals was needed to corroborate the assertion that the missing money was spent on personal expenses and not hidden from creditors. Credit card bills or checks to third parties that show a pattern of purchases would also have been helpful. If the missing funds were expended normally over the years, Mr. Martin could have produced bank statements showing receipt and ultimate disbursement of the missing funds. The absence of these documents combine with the existence of other sources of income to deprive Martin's explanation of credibility.

38. Martin has other arguments concerning where these assets were spent. He contends that some of the proceeds went to pay legal expenses related to litigation with Sylvester and other parties. However, there is no evidence of any payments to any law firms, and a large debt to a law firm is listed on Martin's schedule of creditors. Furthermore, Martin acknowledged that legal bills were sometimes paid out of the accounts of Country Maid or National Flour, and this is borne out by the Country Maid's corporate income tax returns. *See* Bay State Exs. 31a, b, and c (showing $27,000, $20,700, and $36,700 paid for accounting and legal expenses in 1987, 1986 and 1985 respectively). Therefore, once again his explanation is not credible.

39. Martin also contends that some of the missing proceeds went to Country Maid to finance the opening of additional stores. However, the only store opened after June 1, 1985 was a small outlet in the Northbrook commuter train station. Also, Martin has no documents (e.g. cancelled checks) to support this assertion, or even to show how much was invested by Country Maid to open that outlet.

40. Finally, Martin testified that he used personal funds to pay off Country Maid's indebtedness to Bay State and other creditors. However, there are no specific documents to support this assertion.

41. To the extent that the Findings of Fact entered in the first trial on Adversary No. 90 A 1003 are relevant to Count VI of

that Adversary, they are incorporated by this reference. *See Bay State Milling Co. v. Martin,* 141 B.R. 986.

42. Additional facts set forth in the Conclusions of Law will stand as additional Findings of Fact. Legal standards set forth in the Findings of Fact will stand as additional Conclusions of Law.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and Local District Rule 2.33. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(H) (to avoid and recover fraudulent conveyances) and (J) (to object to discharge).

### I. FRAUDULENT CONVEYANCE ACTION

#### A. Elements

2. Under Illinois fraudulent conveyance law, Ill.Rev.Stat.1987 ch. 59, ¶ 4, there are two kinds of fraudulent conveyances. One involves actual fraud or "fraud-in-fact". *Indiana National Bank v. Gamble,* 612 F.Supp. 1272, 1276 (N.D.Ill.1984). Actual fraud occurs when the debtor transfers property with the intent to hinder, delay, or defraud his creditors. Ill.Rev.Stat.1987 ch. 59 ¶ 4 [new statute 1991, ch. 59 ¶ 105(a)(1) ]; *In re Aluminum Mills Corp.,* 132 B.R. 869, 885 (Bankr.N.D.Ill.1991), *citing Tcherepnin v. Franz,* 457 F.Supp. 832, 836 (N.D.Ill.1978). The other involves constructive fraud or "fraud-in-law". Constructive fraud occurs when (1) a voluntary gift is made, (2) there is an existing or contemplated indebtedness against the debtor, and (3) the debtor has failed to retain sufficient property to pay the indebtedness. Ill.Rev.Stat.1987 ch. 59 ¶ 4 [new statute 1991, ch. 59 ¶ 105(a)(2) or 106]; *Aluminum Mills,* 132 B.R. at 888; *Gendron v. Chicago & North Western Transportation Co.,* 139 Ill.2d 422, 437, 151 Ill.Dec. 545, 552, 564 N.E.2d 1207, 1214 (1990).

#### B. Burdens/Standards of Proof

3. Under Illinois authority, actual fraud will not be presumed. *Hofmann v. Hofmann,* 94 Ill.2d 205, 225, 68 Ill.Dec.

593, 600, 446 N.E.2d 499, 506 (1983); *Ray v. Winter,* 67 Ill.2d 296, 300, 10 Ill.Dec. 225, 229, 367 N.E.2d 678, 682 (1977). Therefore, Bay State has the burden of proving all elements of actual fraud under Illinois law by clear and convincing evidence. *Hofmann,* 94 Ill.2d at 225, 68 Ill. Dec. at 600, 446 N.E.2d at 506. This means that Bay State was obliged to prove under this theory that it is highly probable that Martin transferred his shares of Country Maid stock with an actual intent to hinder, delay, or defraud creditors. *Cf. Disner v. Westinghouse Electric Corp.,* 726 F.2d 1106, 1111 (6th Cir.1984) (defining the "clear and convincing" standard).

4. Bay State also has the burden of proving all the elements of constructive ("fraud-in-law") fraud. *In re Martin,* 124 B.R. 69, 73 (N.D.Ill.1991) (collecting authorities). However, a different standard of proof applies to this theory because intent to defraud is presumed when the elements of constructive fraud are established. *Gendron,* 139 Ill.2d at 437, 151 Ill.Dec. at 552, 564 N.E.2d at 1214. *See also In re Metro Shippers,* 78 B.R. 747, 751 (Bankr.E.D.Penn.1987) (discussing the difference between 11 U.S.C. § 548(a)(1) (actual fraud) and 11 U.S.C. § 548(a)(2) (constructive fraud)). Therefore, the Trustee only needs to prove the elements of constructive fraud under Illinois law by a preponderance of evidence. *Martin,* 124 B.R. at 73. *Cf. In re Minnesota Utility Contracting, Inc.,* 110 B.R. 414, 417 (D.Minn.1989) (preponderance standard applies for proving constructive fraud under 11 U.S.C. § 548(a)(2)).

#### C. Fraud in Fact

5. Bay State has shown by clear and convincing evidence that Martin transferred a total of 15% of the outstanding shares of common stock in Country Maid to his three children with intent to hinder and delay his creditors.

#### D. Fraud in Law

6. There is no question that the transfer of shares constituted voluntary gifts. Furthermore, Bay State has proven

that Martin's debt to it and to other creditors such as Sylvester, Bay State, and Wisconsin existed on June 1, 1985. The major issue on trial was whether or not Martin then failed to retain sufficient property to pay the indebtedness, i.e. whether Martin was insolvent at the time of the transfer or whether the transfer caused Martin to become insolvent.

### Standard for determining solvency

7. Defendants urge this Court to examine the issue of solvency from the debtor's perspective. By their argument, Martin must be judged solvent if he could liquidate whatever assets were available to him and pay off his creditors. However, this is not the correct standard under Illinois law (which the parties agree applies here).

8. The policy behind allowing creditors to set aside transfers under a constructive fraud theory is that "property retained by the grantor ... must be sufficient in fact and readily available for the satisfaction of creditors." *Cairo Lumber Co. v. Ladenberger*, 313 Ill.App. 1, 39 N.E.2d 596, 600 (1942). Thus, the test set forth by the Illinois Supreme Court to determine the validity of a transfer under the fraudulent conveyance statute is, "whether or not it directly tended to or did impair the rights of creditors.... A donor may make a conveyance with the most upright intentions, and yet, if the transfer hinders, delays, or defrauds his creditors, it may be set aside as fraudulent." *Birney v. Solomon*, 348 Ill. 410, 181 N.E. 318, 320 (1932). *See also Panther Pumps & Equipment v. Hydrocraft, Inc.*, 566 F.2d 8, 26 (7th Cir.1977) (repeating this test for constructive fraud under Illinois law and citing *Birney* ).

9. A creditor's rights are limited by its ability to collect its debts through whatever legal means are available to it. Therefore, the proper perspective for examining a debtor's solvency is to examine *from the creditors' perspective* what assets are available through various legal processes for payment of the debts. It does not matter that the debtor might pay his debts, if creditors cannot collect that

amount by legal means should the debtor be unwilling to pay them. As the court in *Cairo Lumber* explained, "[t]he law looks to the attainment of practical results, and a solvency which it cannot employ in the payment of the debts of an unwilling debtor is certainly not distinguishable by any valuable difference from insolvency." 39 N.E.2d at 600.

10. Therefore, one must view the issue as to Martin's solvency from his creditors' perspective. Assets must be valued based on what creditors could realize through exercise of their legal rights.

### Legal Issues in the Valuation of Assets and Liabilities

11. Most of Martin's property is jointly held by him and either his wife or other third parties. "As a general rule, an act or contract by one joint tenant respecting the joint property without the authority or consent of his cotenants cannot bind or prejudicially affect the latter." *Jeffers v. Brua*, 40 Ill.App.2d 156, 159, 189 N.E.2d 374, 376 (1st Div.1963).

12. Bay State contends that the value of the Certificates of Deposit must be reduced by half since they were held in joint tenancy by Martin and his father. However, Martin's father died prior to June 1, 1985, and his interest automatically passed to Martin upon his death. Ill.Rev. Stat.1991, ch. 76, ¶ 1. Therefore, the Certificates of Deposit were owned solely by Martin on June 1, 1985, and their full value must be counted in computing Martin's net worth.

13. Bay State contends that Martin is only entitled to count half of the cash accounts (e.g. the checking and savings accounts) and government bonds that were jointly held by Martin and his wife. The rights to jointly held bank accounts are governed by Ill.Rev.Stat.1991, ch. 76 ¶ 2(a) which provides,

> When a deposit in any bank or trust company transacting business in this State has been made ... in the names of two or more persons payable to them when the account is opened ... and when

an agreement permitting such payment is signed by all said persons at the time the account is opened or thereafter the receipt or acquittance of the person so paid shall be valid and sufficient discharge from all parties to the bank for any payments so made.

In *Pescetto v. Colonial Trust & Savings Bank*, 111 Ill.2d 314, 95 Ill.Dec. 501, 489 N.E.2d 1365 (1986), a creditor had a security interest in its debtor's jointly held bank account. The debtor then died and defaulted on the loan, and the creditor enforced its security interest in the account to the full value of the amount due on the loans. The joint tenant then filed suit to establish her rights in the seized account. The Illinois Supreme Court held for the creditor because the debtor and plaintiff had signed a signature card that authorized either party to transact business as to the interest of both joint tenants. The Court stated,

> [a] joint bank account is not the same as a joint tenancy in real property, and is subject to the provisions of the contract between the bank and the depositors.... If the agreement allows one joint depositor to unilaterally pledge the interests of all the joint depositors then such a pledge would survive the death of the pledgor. (citation omitted) *Id.*, 95 Ill. Dec. at 502, 489 N.E.2d at 1366.

Thus, a creditor's right to seize the jointly held bank accounts depends on the contracts signed between the banks and depositors. Bay State has not entered the contracts between the Martins and their banks into evidence. Since the burden of proof lies with Bay State, the Court must assume, in the absence of contrary evidence, that either party to the joint accounts of the Martins had the power to withdraw all the funds in the account, and that creditors could reach the funds accessible to each party.

14. Unlike a bank account, there are no provisions which would allow jointly held U.S. Government bonds to be liquidated upon the signature of only one of two joint tenants. Therefore, the general rule as to jointly held property applies.

Creditors would be limited to Martin's half interest in the Government bonds.

15. All the real property held jointly by Martin has been valued only at Martin's proportionate interest therein because creditors could only not seize any of these properties in their entirety. *See Harms v. Sprague*, 105 Ill.2d 215, 85 Ill. Dec. 331, 473 N.E.2d 930 (1984) (holding that a mortgage executed by less than all joint tenants does no more than create a lien on the interest of the mortgaging party, and does not sever the joint tenancy).

16. Martin's real property has been discounted in the Court's Finding to account for sales costs inherent in their liquidation. Also, the value of Martin's equity interest in Country Maid and National Flour have been reduced to take into account contingencies which lower their value. *See In re Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir.1988) (contingent assets and liabilities must be reduced to their present, expected values before a determination can be made whether a debtor's assets exceed his liabilities).

17. Bay State contends that Martin's checking account in Georgia and his real properties in Wisconsin cannot be counted as assets realizable by creditors. To support its position, it cites a passage from *Cairo Lumber* which states, "[i]f property retained ... is located in another state ... it will not avail [to render the debtor solvent]". 313 Ill.App. at 9, 39 N.E.2d at 600. This contention is incorrect for several reasons. Where property is located out of state, an Illinois court would have *in personam* jurisdiction to order a judgment debtor to apply that property to satisfy the judgment. *Blackhurst v. James*, 304 Ill. 586, 136 N.E. 754 (1922); *Raphael J. Musicus, Inc. v. Safeway Stores, Inc.*, 743 F.2d 503 (7th Cir.1984). Also, Georgia, Illinois, and Wisconsin have all enacted the Uniform Enforcement of Foreign Judgments Act since the opinion in *Cairo* was rendered in 1942. Ga.Code Ann. §§ 9–12–130 *et seq.* (1986); Ill.Rev. Stat. ch. 110, ¶ 12–627 *et seq.* (1991); and Wisc.Stat. § 806.24 (1965). Under this law, when a judgment rendered in another state

is filed with the appropriate in-state court, it will be enforced as if it was rendered in-state. *See, e.g.,* Ill.Rev.Stat. ch. 110, § 12–628. Thus, creditors have ample ability to reach out-of-state assets, and such assets will be counted in computing a debtors insolvency in fraudulent conveyance actions.

 18. Martin contends that his liabilities to Bay State and others were merely contingent as of June 1, 1985, and, as such, they cannot be counted in determining his solvency. However, a contingent liability is protected against fraudulent conveyances as fully as a claim that is certain and absolute. *Dorocke v. Farrington,* 43 Ill. App.2d 394, 193 N.E.2d 593 (1st Dist.1963). Therefore, Martin is incorrect, and contingent liabilities will be counted if there is a likelihood that the contingency will occur.

 19. This Court has not given any value to the contingent liabilities incurred by Martin as a result of his guarantees of Country Maid's and National Flour's debts because the creditors of these corporations were highly unlikely to call upon Martin to honor these guarantees in 1985. *See Xonics Photochemical,* 841 F.2d at 200.

 20. As one of the two operating officers of Wisconsin, Martin was liable for Wisconsin's unpaid federal withholding taxes. 26 U.S.C. § 6672(a); *Ruth v. United States,* 823 F.2d 1091 (7th Cir.1987). Therefore, Wisconsin's tax liability to the IRS must be counted as a personal liability of Martin.

 21. The compensatory damages adjudged by the District Court in Wisconsin were awarded to make the plaintiffs whole for the damages suffered as a result of Martin's actions. *Cf. White v. Benkowski,* 37 Wis.2d 285, 290, 155 N.W.2d 74, 76–77 (1967) (compensatory damages are "given to make whole the damage or injury suffered by the injured party"). This award was based on Martin's actions that occurred prior to June 1, 1985. Thus, the liability for these compensatory damages arose when Martin committed the torts of fraud (against Sylvester) and conversion (against Wisconsin), and when he failed to honor his guarantee of Wisconsin's debt to Bay State and became obliged under state law to make these parties whole for their damages. Since these actions all occurred prior to June 1, 1985, they must be counted as liabilities owed by Martin at that time.

 22. Sylvester's judgment also included punitive damages. Under Wisconsin law, punitive damages are not awarded to compensate the plaintiff for losses. *Fahrenberg v. Tengel,* 96 Wis.2d 211, 234, 291 N.W.2d 516, 521 (1980). Rather they are awarded to punish tortfeasors for their actions and to deter the tortfeasor from engaging in the putative activity again. *School Dist. of Shorewood v. Wausau Insurance Companies,* 168 Wis.2d 390, 484 N.W.2d 314 (1992); Restatement (second) of Torts § 908. Thus, punitive damages are judicially levied fines, and liability for punitive damages does not arise when the tortious act occurs. Rather, it only arises when the jury makes the punitive damage award. These damages will not be included as liabilities of Martin as of June 1, 1985 because they were not awarded by the District Court judgment until 1988.

23. For reasons given in these Findings and Conclusions, it is found and concluded that Martin's conveyance of shares of stock in Country Maid left him insolvent and without sufficient assets to satisfy the claims of his creditors.

## II. OBJECTION TO DISCHARGE

24. In the Findings of Fact and Conclusions of Law entered in Case No. 90 A 1003 on May 18, 1992, the Court discussed the burdens and standards of proof for objections to discharge under 11 U.S.C. § 727. *Bay State Milling Co. v. Martin,* 141 B.R. at 992. The substantive standards for determining whether a debtor's explanation for the dissipation of his assets is satisfactory under § 727(a)(5) were also discussed. *Id.,* at 999. These discussions are incorporated by this reference and will not be repeated here in detail. Generally, however, when plaintiff proves that debtor once owned substantial and identifiable assets that are no longer available to creditors, the debtor becomes obliged to give a satis-

factory explanation for the loss. *Id., citing In re Chalik,* 748 F.2d 616, 619 (11th Cir.1984).

25. The term "satisfactory" is not defined in the Bankruptcy Code, but an explanation must meet two criteria to be called "satisfactory". First, after hearing the explanation, the fact finder must be satisfied. In other words, the explanation must be good enough to eliminate the need for the Court to speculate as to what happened to all the assets. *See In re Martin,* 698 F.2d 883, 888 (7th Cir.1983) ("speculation of the bankruptcy judge or the creditors as to what may have actually been occurring is not an adequate substitute for a believable explanation"). As set forth in *Matter of Shapiro & Ornish,* 37 F.2d 403, 407 (5th Cir.1930).

> the court, after having heard the excuse, the explanation, has the mental attitude which finds contentment in saying that he believes the explanation—he believes what the [debtors] say with reference to the disappearance or shortage. He is satisfied. He no longer wonders. He is content.

26. Second, the explanation must be supported by some documentation. *See In re Chalik,* 748 F.2d at 620 (rejecting the debtor's explanations because they were unsupported by any documents); 4 *Collier on Bankruptcy,* ¶ 727.08 (15th Ed.1992) (collecting authorities). This is not to say a debtor must produce receipts for every minor expenditure, but he must at least produce sufficient documentation so as to free the court from the need to speculate about the veracity of the debtor's explanations.

27. Applying these standards to the instant case, Bay State has proven that Martin possessed about $210,000 in net cash between 1985 and 1988 for which he must account. Thus, Bay State has satisfied its burden of going forward, and the burden shifted to Martin to explain this significant loss of assets. Martin has explained what happened to about $120,000 and supported these explanations with documents. However, Martin's explanations

for what happened to the remaining $90,000 were not at all "satisfactory".

28. Martin has not produced documents to support his assertions that he spent the missing money on living expenses or legal fees or business debts. His explanation of spending on living expenses was not satisfactory because Martin had other sources of income. Moreover, he has not produced bank statements or credit card bills to corroborate his testimony. Martin also admits that he has no explanation for what he did with a $20,000 cash hoard received upon cashing a check in that amount. Therefore, and for reasons more fully discussed earlier, Martin has not satisfied his burden. His discharge must be barred under 11 U.S.C. § 727(a)(5).

### CONCLUSION

By Order entered separately this day, plaintiff is required to submit draft judgments in favor of Bay State Milling Company on the two counts of 91 A 418. The transfers of 250 shares of common stock in Country Maid Bakery Company to each of the defendants, William Martin, Jr., Diana June Franchi, and Betty Lou Doty, shall be set aside and ownership of those shares transferred to the Chapter 7 trustee.

Plaintiff is also required to submit proposed judgment on Count VI of 90 A 1003. Debtor William Martin Sr.'s discharge in bankruptcy will be barred, pursuant to 11 U.S.C. § 727(a)(5).